## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **In re:** | ) | |
| | ) | **Chapter 11** |
| **GPX INTERNATIONAL TIRE** | ) | |
| **CORPORATION,** | ) | |
| | ) | **Case No.  09-** |
| **Debtor.** | ) | |
| | ) | |

### AFFIDAVIT OF CRAIG STEINKE IN SUPPORT
### OF FIRST DAY MOTIONS AND APPLICATIONS

Pursuant to 28 U.S.C. § 1746, I, Craig Steinke, hereby declare as follows:

1.      I am the President and Chief Executive Officer of GPX International Tire

Corporation ("GPX" or the "Company"), GPX and debtor-in-possession in the above captioned

bankruptcy proceeding.  In this capacity, I am familiar with GPX's day-to-day operations,

business and financial affairs.

2.      Except as otherwise indicated, all statements in this affidavit are based upon (a)

my knowledge as President and CEO of GPX, (b) my review of relevant documents, including

GPX's books and records, (c) information supplied to me by other members of GPX's

management and/or GPX's professionals, and (d) my opinion based on my experience and

knowledge of GPX's operations and financial affairs.  If called upon to testify, I would testify to

the facts set forth in this affidavit.

3.      On October 26, 2009 (the Petition Date"), GPX filed a voluntary Chapter 11

petition for relief under Title 11 of the United States Code (the "Bankruptcy Code").

4.      I submit this affidavit in support of the first day motions and applications filed in

GPX's Chapter 11 bankruptcy proceeding.  Part I of this affidavit provides an overview of GPX

and its operations. Part II of this affidavit describes GPX's history. Parts III and IV describe the

primary causes of GPX's financial problems and its Chapter 11 filing. Part V provides an

overview of GPX's capital structure. Parts VI and VII of this affidavit describe, respectively,

GPX's proposed course for this Chapter 11 and a summary of the first day motions.

## I.   OVERVIEW

5.      GPX, a Massachusetts corporation headquartered in Malden, Massachusetts, has

operations in 12 countries. Attached hereto as Exhibit A is an organizational chart reflecting

GPX's current corporate structure.

6.      GPX is a leading independent manufacturer and marketer of highly engineered,

top quality off-the road ("OTR") pneumatic (air filled), solid and semi-solid tires for agricultural,

industrial and construction equipment. GPX sells these branded tires to original equipment

manufacturers (OEMs), such as Bobcat, Caterpillar, Case New Holland and John Deere, and

aftermarket distributors (with small quantities sold through affiliated retail stores). GPX also

provides contract manufacturing and sourcing of branded truck and passenger tires for several

leading tire companies, such as TBC Corp., and until recently, Goodyear and Continental. These

tires are manufactured to customer specifications, produced under their brand names and

distributed through the customers' own dealer networks.

7.      GPX has multiple facilities in the United States, which include a production

facility for solid and semi-solid tires in Gorham, Maine, a network of distribution warehouses

located throughout the U.S. and several retail stores. A list of these facilities is attached hereto

as Exhibit B. GPX's Chinese subsidiary, Hebei Starbright Tire Co., Ltd. ("Starbright") owns a

production facility for solid, semi-solid and pneumatic OTR tires in Hebei Province, China.

Another Chinese subsidiary of GPX coordinates logistics and leases an office and a warehouse in

Tianjin, China, which stores tires prior to shipment to the U.S. GPX also has administrative, sales and warehousing facilities in Brampton, Ontario (as well as smaller warehouses in Quebec and Alberta, Canada), leased by its Canadian subsidiary, and a sales, marketing and distribution office in Rodenbach, Germany operated through its German subsidiary.

       8.     GPX's employs approximately 200 people in the United States, including 49 people at its headquarters in Malden, Massachusetts, 62 at its manufacturing facility in Gorham, Maine, 30 at its retail location and warehouse facility in Texas, and the balance in sales locations and warehouse facilities in sixteen (16) other states. Internationally, GPX's Chinese and Canadian subsidiaries employ approximately 1,200 and 100 people, respectively. GPX subsidiaries in Europe and South Africa employ a total of approximately 20 people.

       9.     GPX generated Net Sales, Gross Profit, Income (Loss) from Operations and Net Income (Loss) for the years ended December 31, 2006 through 2008 and the six months ended June 30, 2009 as set forth below:

| *Dollars in Thousands* | | | | |
|---|---|---|---|---|
| | **Calendar 2006** | **Calendar 2007** | **Calendar 2008**[*] | **To June 30, 2009**[*] |
| **Net Sales** | $462,244 | $479,034 | $503,533 | $162,454 |
| **Gross Profit** | $68,616 | $66,933 | $68,350 | $19,570 |
| **Income (Loss) from Operations** | $16,802 | ($1,235) | ($3,390) | ($12,568) |
| **Net Income** | $2,458 | ($19,538) | ($24,800) | ($21,614) |

[*Numbers are preliminary.]

## II.    ACQUISITIONS AND INVESTMENTS

     10.     GPX was founded in 1922 by Louis Ganz as Gans Tire Salvage. GPX originally focused on the sale of salvaged and surplus tires. Today, GPX is one of the largest independent tire dealers in the world focused on the specialty tire markets. In the 1980's GPX purchased over 450 agricultural, industrial and off-road tire molds from B.F. Goodrich when it exited the

agricultural and off-road markets and used these molds to start the *Galaxy* brand of tires for the agricultural, construction and materials-handling markets.

11.   In 1994 GPX began supplying tires to its first OEM customer, Case/New Holland. In 1997 GPX acquired Redco Wheel Corp. in Red Lion, Pennsylvania in order to be able to expand service to its growing list of OEM customers by supplying tire and wheel assemblies.   In 1999 Ganz Tire changed its name to Galaxy Tire and Wheel, Inc. to better reflect its business and brand.

12.   In 2003, GPX acquired a controlling interest in Rumaguma A.D. ("Rumaguma"), a Serbian company which owned a tire factory located in Rumaguma, Serbia.   Rumaguma produced agricultural and off-road tires.   This acquisition enabled GPX to manufacture its own brand of tires in its own factory, improving both quality and reliability of sourcing.

13.   Effective October 1, 2005, GPX acquired the common stock of Dynamic Tire Corp. of Toronto, Canada ("Dynamic") in a tax-free, stock-for-stock exchange.   Through the Dynamic acquisition, GPX acquired the *Primex* and *Dynamo* branded product lines, a significant contract manufacturing relationship with TBC Corp. and increased low-cost production capacity through relationships with fifteen Chinese plants with which Dynamic had long-term dealings. Upon completion of the acquisition, GPX changed its name from "Galaxy Tire & Wheel, Inc." to "GPX International Tire Corporation" to better reflect both the *Galaxy* and *Primex* brands.

14.   On November 18, 2005, affiliates of Sterling Investment Partners LP ("Sterling"), a private equity firm, invested $41.0 million in exchange for 77,206 shares of Series A Convertible Preferred Stock (the "Series A Preferred Stock") and warrants to purchase 11,523 shares of GPX common stock.   The Series A Preferred Stock was convertible into common stock on a one-for-one basis.

15.    In connection with the Sterling investment, GPX redeemed 55,468 shares of its common stock from its other shareholders and purchased 34,270 Exchangeable Shares previously issued in connection with the Dynamic acquisition.  The redemption and purchase price for these shares totaled approximately $44.2 million and was paid from proceeds of the sale of Series A Preferred Stock to the Sterling affiliates and the issuance of promissory notes in the principal amount of $5.3 million to certain of the redeeming shareholders.

16.    On March 31, 2006, GPX acquired Maine Industrial Tires Limited, an Indiana corporation ("MITL"), for $43.0 million (including repayment of MITL's debt), net of MITL's cash and cash equivalents and a working capital adjustment.  MITL, through its subsidiaries, manufactured an extensive line of solid industrial tires for a variety of applications, including materials handling, logistics, aircraft ground support, metal recycling and waste management. Through the MITL acquisition, GPX acquired the *Brawler* brand name and a leading market share in the solid tire market.

17.    On June 30, 2006, MITL and its U.S. subsidiaries -- Maine Rubber International (a Maine corporation), Monarch Industrial Tires, Inc. (a Texas corporation) and Industrial Tire Services, Inc. (a New York corporation) -- were merged into GPX and its Canadian subsidiaries - - Precision Products Limited and Industrial Tires Limited (both New Brunswick companies) -- were merged into Dynamic.

18.    In connection with the MITL acquisition, GPX issued 17,013 shares of Series B-1 Convertible Preferred Stock and 10,061 shares of Series B-2 Convertible Preferred Stock (collectively, the "Series B Preferred Stock" and, together with the Series A Preferred Stock, the "Convertible Preferred Stock") and warrants to purchase 4,040 shares of common stock to the Sterling affiliates for $15.6 million aggregate consideration.

19.     On March 31, 2006, GPX entered into a credit facility (described more fully in Section V(A), below) provided by a group of banks and other financial institutions led by Citizens Bank of Massachusetts, providing for $160.0 million in senior credit obligations comprised of a six-year $110.0 million term loan facility and a five-year $50.0 million revolving credit facility.  The proceeds of the term loan (net of fees and expenses related to the financing and MITL acquisition) were used:  (i) to finance the MITL acquisition; (ii) to refinance approximately $98.6 million of existing indebtedness of GPX, GPX subsidiaries and MITL; (iii) to fund planned capital expenditures for GPX factories in China and Serbia; and (iv) to pay the $5.3 million notes issued to shareholders in connection with the November 2005 share redemption.  The revolving credit facility and the balance of the proceeds from the term loan were used to provide ongoing working capital and for other general corporate purposes.

20.     In June 2006, GPX issued 2,428 shares of its common stock in exchange for all of the stock of Logi Planning Corporation ("Logi"), a tire distribution business located in Miami, Florida that services the Latin American  and South American tire markets.

21.     In July 2006, GPX purchased the assets of the Whale Factory located in Hebei Province, outside of Beijing, China, for $10.0 million in cash and $5.0 million in assumed debt. The acquisition was made by Starbright, a Chinese company, which is a wholly-owned subsidiary of Starbright Group, Inc., a Cayman Island company, which is a wholly-owned subsidiary of GPX.  The purpose of the acquisition was to allow GPX to better control production of its brand name off-the-road ("OTR") tires, which previously had been produced primarily at other Chinese factories.  Following the acquisition, GPX began upgrading the factory and transferring production of pneumatic OTR tires from other Chinese manufacturers to

the Starbright factory.  Since the acquisition in 2006, GPX has invested nearly $17 million in

new equipment and capital improvements at the Starbright factory.

### III.    THE ANTI-DUMPING PROCEEDING

22.    On June 18, 2007, Titan Tire Corporation ("Titan") and the United Steel, Paper,

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International

Union (collectively, "DOC Petitioners") filed a petition (the "DOC Petition") under the Tariff

Act of 1930 (the "Tariff Act") with the Department of Commerce ("DOC") and the U.S.

International Trade Commission ("ITC") requesting that the DOC and ITC investigate the

importation into the United States of certain pneumatic OTR tires ("subject OTR tires")

manufactured in China.  The petition listed GPX as an importer and its Chinese subsidiary,

Starbright, as an exporter of the subject OTR tires. The investigations sought to determine

whether  the U.S. tire industry was  materially injured or threatened with material injury by

reason of imports from China of subject OTR tires that were allegedly subsidized by the

government of China and/or allegedly sold in the United States at less than fair value.

Bridgestone Americas Holding, Inc., a subsidiary of Bridgestone Corporation, a Japanese

company, entered an appearance in support of the DOC Petition.

23.    At the time the DOC Petition was filed, GPX had operations in 12 countries and

employed approximately 2,600 people worldwide including 460 in North America.  GPX

imported certain subject OTR tires produced by Starbright and Tianjin United Tire & Rubber

International Co., Ltd. ("TUTRIC"), a Chinese company with which it had an exclusive supply

agreement for the U.S. OTR market, as well as non-subject tires produced by these companies

and subject and non-subject tires from various other Chinese suppliers.  GPX also produced non-

subject solid and semi-solid OTR tires at its facilities in Maine and Mississauga, Ontario and OTR tires in its Rumaguma facility.

24.     The ITC and the DOC were both involved in investigations under the Tariff Act. In August 2007, the ITC made a preliminary finding that there was a "reasonable indication" of injury to the domestic tire industry.  The DOC then began its examination of whether Chinese exporters were selling OTR tires at less than normal value ("LTNV") in the United States (an "Antidumping" or "AD" investigation) and whether any Chinese exporter was being unfairly subsidized by the Chinese government such that it had an unfair economic advantage over a U.S. manufacturer of the same type of product (a "Countervailing Duty" or "CVD" investigation).

25.     The AD and CVD Investigations occurred simultaneously.  The determinations made in each investigation were based upon the DOC's analysis of data submitted by "Mandatory Respondents" selected from the entire group of Chinese exporters of subject OTR tires.  The data from the Mandatory Respondents is deemed to be representative of the data that would have come from all producers had the DOC the time and resources to evaluate 100 percent of exports to the U.S.  The DOC normally selects as Mandatory Respondents in each investigation between 2 – 4 exporters who ship the largest quantity of subject merchandise into the United States during the DOC's Period of Investigation ("POI"; calendar 2006 for CVD; 10/1/06 – 3/31/07 for AD).  Only those exporters selected by the DOC to be Mandatory Respondents for a particular investigation have an opportunity to have their individual data and circumstances examined by the DOC and to receive their own specific AD rate and CVD rate. Those respondents not selected as Mandatory Respondents in a particular investigation receive a weighted average CVD and/or AD rate based on the data obtained from the Mandatory

Respondents in those investigations, provided they have previously submitted a Separate Rate Application to the DOC which has been accepted by the DOC. Based upon its belief that its Starbright subsidiary was not receiving any subsidies from the Chinese government and was not selling tires at LTNV, GPX successfully sought to have Starbright selected as a Mandatory Respondent for both the CVD and AD investigations.

26.     In December 2007, the DOC found a preliminary subsidy margin against the GPX Chinese affiliated manufacturing company, Starbright, of 2.38% on imports into the United States and subsequently in May 2008, increased the preliminary subsidy margin to 20.68%. In addition, in February 2008, the DOC found a preliminary dumping margin of 19.73% against Starbright.

## IV.   ADVERSE CONSEQUENCES RESULTING FROM THE ANTI-DUMPING PROCEEDING

27.     Due to the financial pressures and uncertainty created by the CVD and AD investigations, GPX was forced to renegotiate its Senior Credit Agreement and on January 31, 2008 executed an amendment and restatement of the Credit Agreement with its lenders (the "2008 Amendment"). Pursuant to the 2008 Amendment, Dynamic was added as an additional borrower under the Credit Agreement. In conjunction with the 2008 Amendment, Rumaguma borrowed approximately $10 million on a secured basis from a Serbian bank (the "Rumaguma Loan") and repaid existing intercompany loans that had been previously advanced to pay for new equipment and capital improvements at the Rumaguma factory. The $10 million was utilized to repay a portion of the Term Loans under the Credit Agreement in connection with the 2008 Amendment.

28.     In connection with and as a condition of the 2008 Amendment, Sterling invested an additional $6.25 million in GPX, $5.25 million in the form of 9% Subordinated Notes (the

"Sterling SubDebt") and $1 million for 10,000 shares of Series AA Preferred Stock (together

with the Sterling SubDebt, the "2008 Sterling Investment").   In addition, Sterling exchanged its

Convertible Preferred Stock for 22,556 shares of Series BB Participating Preferred Stock

("Series BB Preferred Stock") and received warrants to purchase common stock representing

15% of common equity in excess of $30 million and 5% of common equity in excess of $250

million.

29.     As required by the 2008 Amendment, during the first six months of 2008, GPX

closed its Canadian solid tire division ("ITL") and relocated those operations from its

Missassauga, Canada plant to its Maine facility (Maine Rubber International) and its Starbright

facility.  This restructuring was done to consolidate North American solid tire manufacturing and

to utilize capacity at the Starbright facility to manufacture solid tires, which would not be subject

to the CVD/AD duties imposed on pneumatic OTR tires.  GPX also sold the Missassauga facility

for Cdn$4 million.  These proceeds were used to fund expenses of closing the Canadian facility

(including severance obligations) and relocating equipment and molds to Maine and China.

30.     In September 2008, GPX sold all of the stock of Rumaguma to a subsidiary of

Mitas, s.a., a Czech corporation, for €21.15 million.  The net proceeds of the sale (after payment

of transaction costs and repayment of the Rumaguma Loan), which totaled approximately $28.76

million, were applied to repay a portion of the Term Loans under provisions of the 2008

Amendment.

31.     Based on affirmative final determinations by the DOC in July 2008 in both the

AD and CVD investigations and a final ITC determination finding injury to the U.S. industry in

August 2008, the DOC issued an antidumping order and a countervailing duty order published in

the Federal Register on September 4, 2008 (the "DOC Orders").  Effective upon the publication

date, the DOC began to require a cash deposit from GPX equal to the estimated dumping average margin of 29.93% and a cash deposit equal to the estimated countervailing duty margin of 14% on the subject OTR tires produced by Starbright, for a combined cash deposit rate of 43.93%.

32.    Since June 2007, GPX's out-of-pocket costs associated with the CVD and AD investigations (including legal fees, outside consultants (e.g. economists) and other expenses) totaled more than $8.1 million. This amount excludes the internal costs of dedicating employees to collect and analyze the data and prepare the submissions.

33.    Due to the extreme financial pressures created by the CVD/AD investigation and the DOC Orders, GPX was forced again to renegotiate its Senior Credit Agreement and on January 16, 2009 executed an amendment of the Credit Agreement with its lenders (the "2009 Amendment"). In connection with the 2009 Amendment, Sterling loaned GPX $5 million and obtained a 100% participation interest in a $5 million Tranche C Term Loan as a last-out tranche (the "Last-Out Tranche") of the senior secured credit facility.   In addition, Sterling received warrants to purchase an additional 10% of the fully diluted common equity and the lenders received warrants to purchase 10% of the fully diluted common equity.

34.    In April 2009 GPX sold the assets of Logi to ORIENTE TRIANGLE SDAD., LTD. ("Oriente"), a Panamanian company, for net proceeds of $2.2 million and entered into a Supply and Distribution Agreement with Oriente for distribution of *Galaxy* and *Primex* branded tires in Central and South America. The proceeds of this sale were used for working capital.

35.    Because of the 43.93% duties imposed upon pneumatic OTR tires produced at the Starbright factory, GPX was forced to move production of these tires for the U.S. market to other Chinese facilities, which are charged much lower duty rates. Production at the Starbright facility is now limited to solid tires and pneumatic OTR tires for markets outside the United States.

This, together with reduced demand due to the economic recession, has resulted in Starbright operating at significantly below capacity.

36.     Cash deposits for the AD and CVD duties are paid to the Customs Department as product is imported into the U.S. and are payable by the "importer of record" for such product. Although these cash deposit rates were set forth in the "Final Determinations" issued by the DOC, these are not final rates but only estimated rates that will be reviewed when the DOC conducts its first annual administrative review commencing upon the anniversary of the publication date of the DOC Orders.

37.     On September 9, 2008, GPX filed three (3) complaints contesting the DOC and ITC determinations before the United States Court of International Trade (the "International Trade Court"). On November 12, 2008, the International Trade Court denied GPX's motion for a temporary restraining order and a preliminary injunction to prevent the imposition of the cash deposits equal to 43.93% while the merits of the underlying actions were decided. Ultimately, on September 18, 2009, the International Trade Court issued its decision, finding, *inter alia*, that: (1) the methodology used by the DOC in imposing the AD/CVD duties was unreasonable and unlawful; and (2) the DOC's decision to reject Starbright's request for market oriented treatment was arbitrary and capricious.

38.     Notwithstanding GPX's vindication by the International Trade Court, GPX has been required to make the 43.93% cash deposits for more than a year. Moreover, although the International Trade Court remanded the matter back to the DOC to remedy its AD/CVD determinations, that process will likely take some time. In the meantime, GPX is still required to make the cash deposits. As a practical matter, it does not appear that any reduction or elimination of the AD/CVD duties will occur in the near future.

## V.    CAPITAL STRUCTURE

39.    The chart below sets forth amounts outstanding under certain and related facilities on or about October 23, 2009 (exclusive of interest, fees, expenses and other amounts that may be chargeable), including amounts payable in connection with the early termination of certain interest rate hedging contracts:

| Credit and Related Facility | Approx. Balance Due |
|---|---|
| Tranche B Term Loan | $70,419,259 |
| Tranche C Term Loan | $5,366,926 |
| Revolving Loans | $34,999,036 |
| Letters of Credit | $2,992,530 |
| PIK Amendment and Forbearance Fees | $2,048,605 |
| Swap Termination | $6,725,754 |

### A.    Bank Group Loans

40.    As discussed above, on March 31, 2006, GPX entered into a credit facility provided by a group of banks (the "Bank Group") and other financial institutions led by Citizens Bank of Massachusetts (now RBS Citizens, N.A.), providing for $160.0 million in senior credit obligations comprised of a six-year $110.0 million term loan facility and a five-year $50.0 million revolving credit facility. The revolving credit facility includes up to $5.0 million in letters of credit.

41.    GPX's credit facility is evidenced by, among other things, a Credit and Guaranty Agreement, dated March 31, 2006, as first amended and restated on April 12, 2006, and as further amended and restated on January 30, 2008 (as amended, the "Credit Agreement"). The Credit Agreement has been amended eight times since the second amendment and restatement,

the last of which occurred on August 26, 2009. Pursuant to the January 30, 2008 second amendment and restatement, Dynamic was added as a borrower under the Credit Agreement with respect to the revolving loan facility, although Dynamic's obligations are limited to amounts borrowed by it under the Credit Agreement. As of the Petition Date, Dynamic owed $22,700,000 under the revolving loan facility of the Credit Agreement.

42.     All of GPX's obligations under the Credit Agreement are secured by liens on substantially all of GPX's assets, including pledges of 100% of the stock in each of GPX's domestic subsidiaries, and 65% of the stock in each first-tier foreign subsidiary. GPX's obligations under the Credit Agreement are unconditionally guaranteed by all of GPX's domestic subsidiaries.

43.     Dynamic's obligations under the credit facility are unconditionally guaranteed by 2082320 Ontario, Inc. ("2082320"), an Ontario corporation wholly-owned by GPX that is Dynamic's parent, as well as by GPX and its domestic subsidiaries, and are secured by substantially all of Dynamic's and 2082320's assets, as well as the assets of GPX and its domestic subsidiaries.

44.     Except for the Tranche C Term Loan, all loans under the Credit Agreement bear interest at a rate of LIBOR plus 8%. Pursuant to Amendment No. 8 to the Second Amended and Restated Credit Agreement (the "8[th] Amendment"), all commitments to lend under the revolving credit facility were terminated on August 26, 2009 and no further credit extensions are available thereunder. Prior to termination of the commitments to lend thereunder, availability (and, since such termination, the cap on amounts outstanding) under the revolving loan facility for GPX was based on eighty percent (80%) of its eligible accounts receivable and fifty percent (50%) of its eligible inventory (in each case, subject to certain reserves). Prior to termination of the

commitments to lend thereunder, availability under the revolving facility for Dynamic (and, since such termination, the cap on amounts outstanding) was based on eighty percent (80%) of the aggregate eligible accounts receivable of Dynamic and GPX and fifty percent (50%) of the eligible inventory of Dynamic and GPX (in each case, subject to certain reserves, and reduced by GPX's outstanding amounts).

45.    The eighth amendment to the Credit Agreement (the "8[th] Amendment"), among other things, provided an additional $1.0 million to GPX to fund operations while GPX was pursuing a going-concern buyer for its businesses.  The 8th Amendment contained various asset sale milestones and provided a $5.0 million cap on the existing overadvance under the Credit Agreement.  The Bank Group's obligation to advance under the 8th Amendment expired on August 31, 2009.

46.    All of the advances under the Credit Agreement were made by members of the Bank Group, which does not include any "insiders" of GPX (although Sterling, as defined below, indirectly funded the Tranche C Term Loan through its purchase of a participation interest in the Tranche C Term Loan from RBS Citizens, as described below).

47.    Three Sterling-affiliated investment funds hold a 100% participation interest in the Tranche C Term Loan.  As is described below, Sterling holds both unsecured subordinated debt positions and equity interests in GPX.  The Tranche C Term Loan was advanced under the Credit Agreement, but is a last-out tranche.  The Tranche C Term Loan bears interest at 10%, which accrues daily and compounds quarterly (no cash payment), and matures 6 months after the maturity of the other tranches advanced under the Credit Agreement.

## B.    Trade Debt and Other Obligations

48.    As of the Petition Date and excluding inter-company and insider debt, GPX's non-priority unsecured debt totaled approximately $36.2 million. Of this amount, approximately $5.2 million consisted of trade debt and $31.0 million consisted of other unsecured obligations, such as lease obligations, accrued expenses and unsecured loan obligations.

49.    Prior to the Petition Date, and consistent with its recent practice, GPX made advance payment to employees for wages and salaries. While GPX does not believe that it owes any base wages that may constitute priority claims under Section 507 of the Bankruptcy Code, there may be amounts, accrued in the ordinary course of business, owed on account of overtime pay, expense reimbursement, benefits and vacation and sick pay that may constitute priority claims.

50.    Sterling holds $5.25 million of unsecured subordinated debt (the "Sterling SubDebt") issued on February 15, 2008. The Sterling SubDebt bears interest at 9%, compounded quarterly. All payments on the Sterling SubDebt are subordinated to payment in full of the senior obligations under the Credit Agreement.

51.    David Ganz, a former officer and shareholder and the father of Bryan Ganz, a current officer and director of GPX, holds an unsecured note in the approximate amount of $9.85 million (the "Ganz Note"). The Ganz Note was originally issued in 2002 and matures in 2011 on account of loans to GPX, and bears interest at a rate of nine percent (9%) per annum. All payments under the Ganz Note are subordinated to payment in full of the senior obligations under the Credit Agreement.

52.    Sterling's unsecured claims against GPX also include a $2.0 million fee for services associated with the sale of the Rumaguma subsidiary in September 2008, deferred

16

management fees of approximately $859,000, a $1.7 million financing fee associated with the

Term C Tranche Loan and various contingent "advisory" fees on account of its support and

advise relating to pricing and business structure of the sale.

53.    GPX owes Bryan Ganz, Neil Ganz, Robert Sherkin and Peter Koszo

approximately $957,000, in the aggregate, for deferred compensation from 2007. GPX owes

Bryan and Neil Ganz approximately $858,000 and $429,000, respectively, for success fees in

connection with the sale of the Rumaguma subsidiary in September 2008. Lastly, I am owed a

$500,000 deferred bonus associated with the January 16, 2009 amendment to the Credit

Agreement. My employment agreement also provides for a $500,000 bonus on the earliest to

occur of (a) the refinancing of the senior secured credit facility, (b) a change of control and (c)

March 15, 2010, unless the payment of the bonus would jeopardize GPX's ability to continue as

a going concern in which case payment will be delayed until it would not have such effect.

**C.    Interest Holders**

54.    GPX has four classes of stock: Series AA Preferred Stock, Series BB Preferred

Stock, Common Stock and Special Voting Stock. Sterling holds 10,000 shares of Series AA

Preferred Stock and 22,556.03 shares of Series BB Participating Preferred Stock. There are

approximately 86,890 shares of Common Stock issued and outstanding and owned primarily by

the Ganz family. There are approximately 79,967 shares of Special Voting Stock issued and

outstanding and owned by former common stock holders of Dynamic.

55.    Both Sterling and various members of the Bank Group were issued warrants with

respect to the Common Stock. Options to acquire 10,200 shares have been granted (and remain

outstanding) to GPX employees under the GPX Equity Incentive Plan. All of these options have

vested. Lastly, GPX's board of directors approved a grant of 26,737 shares of restricted stock to

me, 50% of which vested on grant and 50% of which vested 18 months following the grant date

The grant was to be effective in February 2009 but final documentation has not been executed

and the shares have not yet been issued.

## VI.    PROPOSED DISPOSITION OF DEBTOR'S ASSETS

**A.    Motion (A) to Authorize Debtor to Effectuate Asset Purchase Agreement With Alliance Tire Co. (1992) USA Ltd,; (B) To Authorize Sale of Certain of GPX's Assets By Private Sale Free and Clear of Liens, Claims and Interests; (C) To Authorize the Assumption and Assignment of Executory Contracts; (D) To Authorize the Rejection of Executory Contracts; and (E) For Related Relief.**

56.    In GPX *'s Motion (A) to Authorize Debtor to Effectuate Asset Purchase*

*Agreement With Alliance Tire Co. (1992) USA Ltd,; (B) To Authorize Sale of Certain of GPX's*

*Assets By Private Sale Free and Clear of Liens, Claims and Interests; (C) To Authorize the*

*Assumption and Assignment of Executory Contracts; (D) To Authorize the Rejection of*

*Executory Contracts; and (E) For Related Relief*, GPX seeks authority to sell certain of GPX's

assets (collectively the "Alliance Assets") related to its off-highway tire business and truck tire

business Alliance Tire Co. (1992) USA Ltd. ("Alliance") by private sale free and clear of all

liens, claims and interests.

57.    The Alliance Assets include the following:

a.    The brand names *Galaxy* and *Primex* for all product categories and product designs, and distribution rights with respect to the "Aeolus" branded truck tires in the United States;

b.    Inventory and accounts receivable relating to the Alliance Assets, and rights and causes of action incidental thereto;

c.    Certain equipment and tangible personal property located in the U.S. associated the OTR/Truck Unit, including molds, tooling, bead rings and exchangeable plates used with the Alliance Assets;

d.    Equity interests in GPX Tyre South Africa (Pty) Limited ("GPX South Africa"), a wholly-owned subsidiary of GPX; and

e.    Certain assumed contracts

58.    The purchase price for the Alliance Assets is $38,300,000 (the "Alliance Purchase

Price"), consisting of (a) $33,000,000 in cash, and (b) the assumption by Alliance of certain

liabilities in an amount estimated at $5,300,000 (the "Assumed Liabilities").  The Alliance

Purchase Price is subject to a dollar for dollar working capital adjustment to the extent that the

net working capital at closing is greater or less than $27,900,000.  Alliance has made a good faith

deposit of $1,000,000.  Alliance's obligations under the APA are not subject to any financing

contingency.

59.    Because GPX's businesses share administrative functions, it is necessary for the

purchasers of those businesses to continue to share certain administrative functions while the

orderly separation of those administrative functions is effectuated.

60.    The Alliance APA and the Dynamic APA (as defined below) therefore require

GPX, Alliance and Dynamic to enter into various agreements to insure orderly operations after

the closing of the sales to the purchasers of the Alliance Assets and the Dynamic Assets.  Among

others, Dynamic will require a license from Alliance in order to sell *Galaxy* and *Primex* brand

tires in Canada.  Dynamic has agreed to provide administrative and support functions to Alliance

for a period after the closing of the sale.

61.    The Alliance APA is the product of arms' length negotiations between GPX and

Alliance.  GPX and its investment banker, TM Capital, engaged in an effort to market GPX's

assets for sale prior to accepting the Alliance offer for the Alliance Assets and, subject to the

entry of a bid procedures order, GPX and TM Capital will solicit higher and better counteroffers

from likely potential bidders.

19

**B.    Motion (A) to Authorize Debtor to Effectuate Asset Purchase Agreement
With 2220753 Ontario Inc.; (B) To Authorize Sale of Certain of GPX's
Assets By Private Sale Free and Clear of Liens, Claims and Interests; (C) To
Authorize the Assumption and Assignment of Executory Contracts; (D) To
Authorize the Rejection of Executory Contracts; and (E) For Related Relief.**

62.    In GPX *'s Motion (A) to Authorize Debtor to Effectuate Asset Purchase*

*Agreement With 2220753 Ontario Inc.; (B) To Authorize Sale of Certain of GPX's Assets By*

*Private Sale Free and Clear of Liens, Claims and Interests; (C) To Authorize the Assumption*

*and Assignment of Executory Contracts; (D) To Authorize the Rejection of Executory Contracts;*

*and (E) For Related Relief,* GPX seeks authority to sell GPX's shares of capital stock in 2082320

Ontario Inc. along with certain other related assets, including include (a) certain Dynamo

trademarks, (b) certain molds related to the Dynamo brand and private label contract

manufacturing, (c) the lease of the facility located at 14558-121A Avenue, Edmonton, Canada,

(d) a Microsoft License Agreement between Microsoft Licensing, GP and GPX, and (e) rights

under certain letter agreements regarding GPX's Canadian Aftermarket Sales Compensation

Program and (f) certain software licenses. (collectively the "Dynamic Assets") to Ontario by

private sale free and clear of all liens, claims and interests.

63.    Ontario was formed by Allegro Rubber International Inc., Robert G. Sherkin

("Sherkin")[1] and Peter Koszo ("Koszo"), who are managers of Dynamic, and interest holders in

GPX, and therefore insiders as that term is defined in Section 101(31) of the Bankruptcy Code.

64.    As set forth above in Paragraph 60, the Alliance APA and the Dynamic APA

require GPX, Alliance and Dynamic to enter into various agreements to insure orderly operations

after the closing of the sales.

65.    The Dynamic APA is the product of arms' length negotiations between GPX and

Ontario.  GPX and its investment banker, TM Capital Corp. ("TM Capital"), engaged in an effort

---

[1] Sherkin is also the former majority owner of Dynamic Tire Corp., which GPX acquired in 2005.

to market GPX's assets for sale prior to accepting the Ontario offer for the Dynamic Assets and, subject to the entry of a bid procedures order, GPX and TM Capital will solicit higher and better counteroffers from likely potential bidders.

C.   **Motion To Authorize Sale of GPX's Solid Tire Assets By Public Auction Free and Clear of Liens, Claims and Interests.**

66.   In GPX*'s Motion To Authorize Sale of Solid Tire Assets By Public Auction Free and Clear of Liens, Claims and Interests*, GPX seeks authority to sell its solid tire unit (the "Solid Tire Assets").

67.   The Solid Tire Assets' operations include manufacturing facilities in Gorham, Maine, Red Lion, Pennsylvania, and Hebei Province, China.  GPX owns the facility in Red Lion, Pennsylvania (the "Red Lion Facility"), which consists of an 118,000 square foot facility used in the manufacture of wheels, mounting of assemblies, and the distribution of solid and pneumatic tires for the solid tire, pneumatic aftermarket, and original equipment business units.  The facility consists of approximately 50,000 square feet of manufacturing, 56,000 square feet of warehouse, distribution and storage space, and 12,000 square feet of office space.  .  The Solid Tire Assets' manufacturing operations are conducted at the Gorham, Maine facility and Red Lion Facility in the U.S. and in China through GPX's wholly owned, indirect subsidiary, Starbright.

68.   GPX is and will continue to seek offers for the purchase of the Solid Tire Assets. In conjunction with the sale of the Alliance Assets and the Dynamic Assets, GPX intends to seek offers to purchase the Solid Tire Assets.  The bid procedures requested by GPX will allow GPX to sell any combination of the Alliance Assets, Dynamic Assets, and/or the Solid Tire Assets. GPX reserves the right to enter into a stalking horse agreement for the Solid Tire Assets.

## VII.   First Day Motions[2]

**A.**   **Motion For Approval of Bidding Procedures and Termination Fee Provision in Connection With Debtor's Motion to Authorize Sale of Certain of GPX's Assets to Alliance Tire Co. (1992) By Private Sale Free and Clear of Liens, Claims and Interests.**

69.   In the *Motion By Debtor For Approval of Bidding Procedures and Termination Fee Provision in Connection With Debtor's Motion to Authorize Sale of Certain of GPX's Assets to Alliance Tire Co. (1992) By Private Sale Free and Clear of Liens, Claims and Interests*, GPX seeks approval of sales and bidding procedures and termination fee provisions (the "Alliance Bid Procedures") in conjunction with the motion to sell the Alliance Assets.

70.   Among other things, the Alliance Bid Procedures establish mechanisms for (i) solicitation and submission of competing bids, (ii) treatment of assumed and assigned leases, and (iii) a termination fee and expense reimbursement in the event that Alliance is not the successful bidder.

71.   GPX seeks approval of the Alliance Bid Procedures to ensure an orderly sale process and promote the maximum recovery for the Alliance Assets.

72.   The Alliance Bid Procedures are the product of an arms length negotiation between Alliance and GPX, and I believe that the Alliance Bid Procedures are reasonable and appropriate under the circumstances.

**B.**   **Motion By Debtor For Approval of Bidding Procedures and Termination Fee Provision in Connection With Debtor's Motion to Authorize Sale of Certain of GPX's Assets to 2220753 Ontario Inc. By Private Sale Free and Clear of Liens, Claims and Interest.**

73.   In the *Motion By Debtor For Approval of Bidding Procedures and Termination Fee Provision in Connection With Debtor's Motion to Authorize Sale of Certain of GPX's Assets*

---

[2] Capitalized terms not otherwise defined in Section VII of this affidavit shall have the meanings ascribed to them in the respective motions.

*to 2220753 Ontario Inc. By Private Sale Free and Clear of Liens, Claims and Interests*, GPX seeks approval of sales and bidding procedures and expense reimbursement provisions (the "Dynamic Bid Procedures") in conjunction with the motion to sell the Dynamic Assets.

74.     Because the sales of the Alliance Assets and the Dynamic Assets are interrelated, it is necessary, in order to permit interested parties to make counter-offers for either the Alliance Assets, the Dynamic Assets or the combined assets, for the sales of the Alliance Assets and the Dynamic Assets to proceed on the same schedule.  Therefore, GPX seeks to establish the same procedures and schedule for the sales of the Alliance Assets and the Dynamic Assets.

75.     Among other things, the Dynamic Bid Procedures establish mechanisms for (i) solicitation and submission of competing bids, (ii) treatment of assumed and assigned leases, and (iii) expense reimbursement in the event that Dynamic is not the successful bidder.

76.     GPX seeks approval of the bidding procedures to ensure an orderly sale process and promote the maximum recovery for the Dynamic Assets.

77.     The Dynamic Bid Procedures are the product of an arms length negotiation between Ontario and GPX, and I believe that the Dynamic Bid Procedures are reasonable and appropriate under the circumstances.

**C.      Motion by Debtor for Approval of Bidding Procedures in Connection with Debtor's Motion to Authorize Sale of the Solid Tire Assets by Public Auction Free and Clear of Liens, Claims and Interests.**

78.     In the *Motion by Debtor for Approval of Bidding Procedures in Connection with Debtor's Motion to Authorize Sale of the Solid Tire Assets by Public Auction Free and Clear of Liens, Claims and Interests*, GPX seeks approval of sales and bidding procedures (the "Solid Tire Bid Procedures") in conjunction with the motion to sell the Solid Tire Assets.

79.     Among other things, the Solid Tire Bid Procedures establish mechanisms for (i) solicitation and submission of competing bids, (ii) treatment of assumed and assigned leases. GPX seeks approval of the bidding procedures to ensure an orderly sale process and promote the maximum recovery for the Solid Tire Assets.

80.     The bid procedures requested by GPX will allow it to sell any combination of the Alliance Assets, Dynamic Assets, and/or the Solid Tire Assets.  GPX reserves the right to enter into a stalking horse agreement for the Solid Tire Assets upon terms and conditions that are subject to separate Court approval.

**D.     Motion For Entry of an Order (I) Authorizing The Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Hearing on The Further Use of Cash Collateral, And (IV) Granting Other Relief.**

81.     In the *Motion For Entry of an Order (1) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Hearing on the Further Use of Cash Collateral, and (IV) Granting Related Relief* (the "Cash Collateral Motion") GPX seeks to use the Cash Collateral of the Bank Group.  The Cash Collateral Motion requests the entry of an order authorizing the emergency use of the Cash Collateral to prevent immediate and irreparable harm to GPX's operations pending the scheduling of a hearing on the continued use of the Cash Collateral.  As a consequence of the Chapter 11 filing, GPX is unable to continue operating its business without using the cash collateral of the Bank Group, which asserts liens against, among other things, its cash, accounts receivable and inventory (the "Cash Collateral").  Despite GPX's efforts to secure additional financing to fund its operations, no such financing was forthcoming. Without the use of the Cash Collateral, GPX lacks the ability to pay expenses essential to the operations of its business.  Without the use of the Cash Collateral, the continued operation of

GPX's business would not be possible, and serious and irreparable harm to GPX and its bankruptcy estate would result.

82.     Attached to the proposed order approving the Cash Collateral Motion is a budget for the period commencing October 26, 2009 to January 24, 2009 (the "Budget" and "Budget Period," respectively) which reflects GPX's anticipated receipts and disbursements during the Budget Period. Among other things, the Budget shows that GPX has adequate cash to operate its business and pay its expenses, including its professional fees, that are incurred during the Budget Period. Specifically, the Budget shows that GPX's cash balance on the Petition Date is approximately $5 million and that while the cash balance varies during the Budget Period, GPX has at all times approximately $2 million in cash with approximately $3.3 million in cash at the end of the Budget Period. The Budget also reflects that GPX has sufficient cash to purchase inventory and generate accounts receivable and to otherwise operate its business.

83.     The Cash Collateral Motion describes and details the adequate protection that GPX proposes to grant to the Bank Group for the use of the Cash Collateral, including, among other things, certain adequate protection payments and replacement liens (the "Adequate Protection Liens") on GPX's assets. Among other things, GPX proposes that the Court recognize in the order that the Bank Group may be entitled to a superpriority claim as provided under Section 507(b) of the Bankruptcy Code.

84.     In conjunction with the requested use of Cash Collateral, the proposed order approving such use would expressly provide for a carve out from the Bank Group's liens for the payment of, among other things, the U.S. Trustee fees, certain accrued and unpaid employee wages and salaries, taxes, certain amounts authorized to be paid by the Court to employees in accordance with the Severance and Incentive Plan, certain accrued and unpaid professional fees

and expenses for GPX's retained professionals and certain amounts for professionals retained by a statutory committee of unsecured creditors.

85.     The purpose of the use of the Cash Collateral will thus be to preserve, maintain and enhance the going concern value of GPX's operations, as well as to protect creditors and other persons dependent on GPX's continued operations.  Any interest in the Cash Collateral which may be held by the Bank Group will be protected by the adequate protection being provided and GPX's continued operations.  The proposed Cash Collateral Order provides that GPX will make monthly payments to the Bank Group in the amount of $225,000, which payment is designated for the Bank Group's professional fees subject to GPX and any other party-in-interest's right to seek a determination from the Court that those payments should be recharacterized in the event that the Bank Group is deemed to be undersecured.  Except for those payments, no other payments required to be made to the Bank Group during the Budget Period on account of their claims that have an outstanding balance of approximately $120 million except from the proceeds realized from the proposed sales of GPX's businesses.  I believe that the proposed terms for GPX's use for the Cash Collateral are reasonable, customary and appropriate under the circumstances of this case.

   **E.     Motion to Honor Warranties And Prepetition Obligations to Customers And to Otherwise Continue Customer Programs in The Ordinary Course of Business.**

86.     In the *Motion to Honor Warranties And Prepetition Obligations to Customers And to Otherwise Continue Customer Programs in The Ordinary Course of Business*, GPX seeks the authority to honor its pre-petition customer programs and warranties.

87.     As of the Petition Date, GPX had established business practices with its customers and dealers (collectively the "Customer Programs") that: (a) allowed customers to

return defective or damaged product; and (b) provided for various discounts based upon annual purchases.

88.    Based on GPX's current financial statements, the credits for the return of defective or damaged products equaled $1,464,988 for 2008 and $467,054 for the six month period ending June 30, 2009.

89.    GPX has booked approximately $26,000 pursuant to the GPX Tire Dealer Marketing program by which GPX provided discounts to its dealers.

90.    The industry in which GPX operates is competitive.  GPX negotiated and extended the Customer Programs as a necessary step to keep its best and highest volume customers and dealers.  If GPX's Customer Programs are not honored, it is likely that GPX's customers and dealers may either reduce the level of or terminate their purchases from GPX, resulting in a substantial reduction in revenue.

91.    Maintaining GPX's customer base is essential to the preservation of the value of GPX operations and to the consummation of the pending sale transactions.  The failure to honor the Customer Programs will severely and irreparably impair GPX's relationships at a critical time in these bankruptcy proceedings.

92.    As a percentage of revenue, and when compared to the potential loss of market share which would undoubtedly result from GPX's failure to honor the Customer Programs, the payments that would be required to honor the Customer Programs are *de minimus*.

**F.      Motion of Debtor and Debtor-in-Possession for Entry of an Order
Establishing Procedures Regarding Reclamation and Section 503(b)(9)
Claims Asserted against GPX's Estate.**

93.      In the ordinary course of its business, GPX purchases materials and goods (the

"Goods") which are vital and necessary to the continued operation of its business.

94.      As of the Petition Date, GPX had received Goods for which it had not yet paid,

including Goods received within twenty (20) days of the Petition Date and goods received within

forty-five (45) days of the Petition Date.  As a result of the commencement of this case, GPX

may receive reclamation claims from various vendors or other parties with respect to the Goods.

95.      GPX seeks the entry of an Order, pursuant to Sections 105, 503(b)(9) and 546(c)

of the Bankruptcy Code, Bankruptcy Rule 9019 and MLBR 3002-1, authorizing and establishing

procedures regarding (1) demands to reclaim goods received by GPX during the forty-five (45)

day period prior to the bankruptcy petition pursuant to Section 546(c) of the Bankruptcy Code,

and (2) claims asserting an administrative expense priority for goods received by GPX during the

twenty (20) day period prior to the bankruptcy petition pursuant to Section 503(b)(9) of the

Bankruptcy Code (collectively the "Reclamation Claims").

96.      By establishing procedures for asserting and responding to Reclamation Claims,

GPX will avoid any disruption of its operations.  Approving the proposed procedures is in the

best interest of GPX and its creditors because it will avoid the need to address multiple

Reclamation Claims on a piecemeal basis.

97.      Unless Court-approved procedures for fixing and/or resolving the Reclamation

Claims are implemented, holders of asserted Reclamation Claims may attempt to interfere with

the postpetition delivery of Goods and/or may initiate piecemeal litigation to establish their

Reclamation Claims on an individual basis.  Any disruption in GPX's receipt and use of Goods

during the critical, early stages of GPX's case will hinder GPX's postpetition operations and will negatively impact GPX's estate. Piecemeal litigation will distract GPX's management and professionals from GPX's sale efforts and will increase the costs associated with addressing the Reclamation Claims.

**G.    Motion of Debtor And Debtor-in-Possession For Entry of an Order Authorizing GPX to Pay Prepetition Warehouse, Customs, Carrier And Shipping Charges in The Ordinary Course of Business.**

98.    In the *Motion of Debtor And Debtor-in-Possession For Entry of an Order Authorizing GPX to Pay Prepetition Warehouse, Customs, Carrier And Shipping Charges in The Ordinary Course of Business* (the "Warehouse Motion"), GPX seeks the entry of an order authorizing GPX to pay prepetition warehouse, customs, carrier and shipping charges (collectively the "Transportation Charges") incurred in the ordinary course of its business. GPX estimates that the Transportation Charges will not exceed $80,000.

99.    Payment of the Transportation Charges is necessary in order to obtain receipt of materials and goods which have been purchased by GPX and are necessary for its continued operation of its business as a going concern. Because GPX is unable to obtain materials and goods without payment of the Transportation Charges, and because any claims resulting from unpaid Transportation Charges may be entitled to a lien and/or priority under the Bankruptcy, the allowance of this motion is in the best interest of GPX's estate.

100.    In the ordinary course of GPX's business, GPX incurs Transportation Charges which are necessary to receive and deliver materials and goods to its domestic and foreign locations. The Transportation Charges also include the cost to store transported goods at warehouses owned by unaffiliated third-parties.

101.   The Transportation Charges are incurred in the ordinary course of GPX's business.  The payment of the Transportation Charges will allow GPX to take possession of materials and goods, which it has already purchased, and utilize such materials and goods for the benefit of the estate.

**H.    Motion For Order Authorizing Debtor to Pay Prepetition Sales, Use and Other Taxes And Government Charges.**

102.   In the *Motion of Debtor And Debtor-in-Possession For Entry of an Order Authorizing GPX to Pay Prepetition Sales, Use And Other Taxes And Government Charges*, GPX seeks the entry of an order authorizing GPX to pay prepetition sales, use and other taxes and government charges incurred in the ordinary course of its business which are otherwise entitled to priority status pursuant to Sections 503(b)(1)(B) or 507(a)(8) of the Bankruptcy Code. Because any claims resulting from unpaid taxes would be entitled to priority under the Bankruptcy Code and because the payment of such taxes in the ordinary course will reduce GPX's exposure to unnecessary interest and penalty claims, the allowance of this motion is in the best interest of GPX's estate.

103.   GPX incurs, and has historically incurred, state taxes in ten (10) states, including: Massachusetts, Alabama, California, North Carolina, New Jersey, New York, Pennsylvania, South Carolina, Tennessee, and Texas.  These taxes include sales and use taxes, as well as property taxes for equipment and real estate maintained in these states.  GPX also incurs, and has historically incurred, federal excise taxes.

**I.    Motion for Entry of Order (i) Prohibiting Utilities From Discontinuing, Altering, or Refusing Service; And (ii) Establishing Procedure For Determining Adequate Assurances Pursuant to Section 366 of The Bankruptcy Code.**

104.    In the *Motion for Entry of Order (i) Prohibiting Utilities From Discontinuing, Altering, or Refusing Service; And (ii) Establishing Procedure For Determining Adequate Assurances Pursuant to Section 366 of The Bankruptcy Code* (the "Utility Motion"), GPX seeks the entry of an order: (a) prohibiting its utility providers (collectively the "Utility Providers") from altering, refusing, or discontinuing service, (b) deeming the Utility Providers adequately assured of future performance, and (c) establishing procedures for determining adequate assurance of future payment.

105.    GPX projects that aggregate utility payments of approximately $150,000 will be due monthly.  To provide adequate assurance of payment for future services to the Utility Providers, GPX proposes to deposit a sum equal to GPX's estimated cost of monthly utility consumption - $150,000 - into a newly-created, debtor-in-possession account (the "Utility Deposit Account") within ten (10) days after the entry of an Order granting this motion.  The Utility Deposit Account will be segregated, pending further order of the Court, for the purpose of providing the Utility Providers with adequate assurance of payment of their post-petition services to GPX.

106.    GPX also seeks to establish procedures (the "Procedures") by which the Utility Providers may request additional adequate assurance of future payment in the event the Utility Providers believe that Utility Deposit Account does not provide them with satisfactory assurances.  GPX's proposed procedures are detailed in the Utility Motion, and I believe they provide a reasonable opportunity for the Utility Providers to request additional assurance of future performance.

107.    GPX cannot continue to operate without ongoing Utility Services.  It is therefore critical that Utility Services continue uninterrupted.

31

**J.     Motion of Debtor for Entry of an Order Pursuant to Sections 507(a), 363(b) and 105(a) of the Bankruptcy Code Authorizing Payment of Certain Pre-petition: (i) Wages, Salaries and Other Compensation; (ii) Employee Medical, Pension and Similar Benefits; (iii) Reimbursable Employee Expenses; and (iv) Workers' Compensation Benefits.**

108.     In the *Motion of Debtor for Entry of an Order Pursuant to Sections 507(a), 363(b) and 105(a) of the Bankruptcy Code Authorizing Payment of Certain Pre-petition: (i) Wages, Salaries and Other Compensation; (ii) Employee Medical, Pension and Similar Benefits; (iii) Reimbursable Employee Expenses; and (iv) Workers' Compensation Benefits* (the "Wage Motion"), GPX seeks an order authorizing, but not directing, GPX to pay its employees' prepetition commissions, overtime wages, benefits and expenses as set forth in the Wage Motion.

109.     On October 26, 2009, GPX paid its employees for the wages and salaries customarily due for the week ending October 23, 2009.  On the Petition Date, however, there may have been some pre-petition employee compensation charges that were not paid in advance, such as overtime wages due to GPX's non-salaried employees (including taxes associated with such wages), benefits due to its employees on account of services rendered pre-petition, and expenses incurred on behalf of GPX pre-petition (collectively the "Employee Compensation").

110.     It is crucial that GPX be permitted to pay the Employee Compensation.  Approval of such payments will assist in maintaining the continuity of GPX's business and will preserve the morale of its employees during the administration of the estate.  Moreover, a potential loss (or delay in receipt) of earned compensation would work a hardship on GPX's employees.

111.     The ability to pay the pre-petition Employee Compensation is necessary to ensure that GPX can retain employees knowledgeable about GPX's day-to-day operations and financial affairs, and to provide an incentive for GPX's employees to continue to provide quality services to GPX's customers.

112.   GPX customarily reimburses its employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of GPX. These reimbursable expenses include, among other expenses, those incurred in connection with travel, long-distance telephone charges, and cellular phone charges. In some instances, employees may use personal credit cards for which the employee pays the bill and upon submission of the receipt, is then reimbursed by GPX. Because the employees do not always submit claims for reimbursement promptly, it is difficult for GPX to determine the exact amount outstanding at any particular time.

113.   As of the Petition Date, GPX had accrued, in the ordinary course of business, earned but unused vacation time and/or sick leave for various employees.

114.   GPX has established various plans and policies for the benefit of its employees, which include a health plan covering medical insurance and dental insurance, workers' compensation insurance, and a non-matching 401(k) retirement plan (collectively, the "Employee Benefits"). The employees' cost for such Employee Benefits is deducted from their wages.

115.   GPX proposes to pay and/or honor the total amount of Employee Compensation (inclusive of applicable taxes) as of the Petition Date. GPX does not propose to pay any employee an amount in excess of the $10,950 priority cap set forth in Section 507(a)(4) of the Bankruptcy Code.

**K.    Motion by GPX And Debtor-in-Possession For Order Authorizing (A) The Continued Use of GPX's Cash Management System, (B) Maintenance of Debtor's Existing Bank Accounts And Business Forms, And (C) Related Relief.**

116.   In the *Motion by Debtor And Debtor-in-Possession For Order Authorizing (A) The Continued Use of Debtor's Cash Management System, (B) Maintenance of Debtor's Existing*

*Bank Accounts And Business Forms, And (C) Related Relief* (the "Bank Account Motion") GPX

seeks the entry of an order, among other things, authorizing the continued use of GPX's cash

management system and authorizing the maintenance and continued use of GPX's existing bank

accounts and business forms.

117.     Prior to the commencement of this case, GPX maintained six (6) bank accounts

(collectively, the "Bank Accounts") at three (3) financial institutions (collectively, the "Banks").

A list of the Banks and the Bank Accounts is attached to the Bank Account Motion as Exhibit A.

GPX's centralized cash management system is coordinated through GPX's corporate offices, and

the primary accounts utilized in the system are maintained at Citizens Bank of Massachusetts.

118.     In light of the size and complexity of GPX's cash management operations, GPX

cannot afford a disruption in its cash management procedures.  It is essential that GPX be

permitted to continue to manage its cash and transfer monies as needed in the ordinary course of

its business.  GPX will continue to maintain strict records with respect to all transfers of cash so

that all transactions can be readily accounted for and recorded properly.

119.     GPX's cash management system is a customary and essential business tool.

GPX's cash management system is similar to those commonly employed by corporate

enterprises comparable to GPX in size and complexity.  The widespread use of such systems is

attributable to the numerous benefits they provide, including the ability to control corporate

funds, invest idle cash, ensure cash availability and reduce administrative expenses.  GPX's cash

management system facilitates the movement of funds and the development of timely and

accurate account balance and presentment information.  These controls are especially important

here, given the volume of cash transactions managed through GPX's centralized cash

management system.

120.    It would be unduly burdensome for GPX to establish an entirely new system of accounts and a new cash management and disbursement system.  The maintenance of GPX's centralized cash management system in its current form is not only essential, but also in the best interests of GPX's estate and its creditors.

121.    In conjunction with the use of its existing cash management system, GPX is requesting that it not be required to close its prepetition bank accounts and open debtor-in-possession accounts.  GPX will, nevertheless, mark its existing checks and arrange for the printing of new checks, when such become necessary, with a "Debtor-in-Possession" designation and GPX's case number.  GPX's personnel can and will distinguish between prepetition and post-petition obligations without closing existing accounts and opening new ones.

122.    In conjunction with the use of its pre-petition accounts, GPX seeks authorization to maintain and continue to use any and all existing stationery, correspondence and business forms associated with the Bank Accounts.  This relief is necessary to prevent GPX from incurring unnecessary and burdensome administrative costs and delays.

**L.      Motion for Order Authorizing and Approving Senior Management Incentive Program and Employee Severance Programs.**

123.    In the *Motion of Debtor And Debtor-in-Possession For an Order Approving Employees Incentive Programs* (the "Incentive Program Motion"), GPX seeks the entry of an order approving the employee incentive programs adopted by the Board of Directors of GPX in August of 2009 in conjunction with the company's determination to seek sales of its assets.  At that time the Bank Group assented to the employee incentive programs, and has agreed to carveout funds from its cash collateral for the payments under the employee incentive programs.

124.    GPX seeks approval of (a) the Incentive Program, for GPX's most senior executives, Craig A. Steinke, President and Chief Executive Officer, Bryan S. Ganz, Treasurer

and Chairman of GPX's board of directors, and Jeffrey Lucas, Chief Financial Officer
(collectively, the "Senior Executives"); and (b) the Retention Program for other selected
management employees (the "Participating Employees").

125.   The Senior Executives and the Management Employees are essential to the sales
of GPX's business units.  In addition to performing their customary duties, the Senior Executives
and the Management Employees face the additional work associated with the sales of GPX's
business units and must address the myriad issues that arise in any Chapter 11 bankruptcy
proceeding.  It would be difficult, if not impossible, for GPX to replace the Participating
Employees, and their departure would cause delays and create additional costs that would likely
exceed the amount proposed to be paid under the Employee Programs.

I.   The Incentive Program.

126.   Under the Incentive Program, the Senior Executives would be entitled to receive
Incentive Payments only upon the terms set forth in the Incentive Programs Motion.  The
Incentive Payments would be earned and payable as follows: (a) fifty percent (50%) of the
Incentive Payments earned and payable upon the consummation of the sale of a single business
unit, (b) seventy-five percent (75%) of the Incentive Payments earned and payable upon the
consummation of the sales of two business units, and (c) one hundred percent (100%) of the
Incentive Payments earned and payable upon the sale of three business units.

127.   In the event that all three business units are not sold, the Senior Executives would
earn and be paid the balance of any Incentive Payments not previously earned and paid by
formulating and implementing (subject to Court approval) a plan for the orderly liquidation of
GPX's remaining assets.  In order to qualify for Incentive Payments under this scenario, the

Senior Executives would be required to spend not less than ninety (90) days implementing the liquidation plan.

II.    The Retention Program.

128.    Under the Retention Program, a fund would be created for the Management Employees.  The Retention Program is a program designed to maintain employment of critical mid-level employees.  GPX has identified thirty-eight (38) potential participants in the Retention/Severance Program.  GPX will make final decisions, in its business judgment, as to who will be eligible to participate in the fund described in the Incentive Program Motion.  The amount paid to any one employee will not exceed one-third (1/3) of such employee's annual base salary.

129.    Under the Retention-Program, the Retention Payments would be fully earned and payable upon the earlier to occur of (a) the involuntary termination of any Management Employee, on or before February 15, 2010, other than for cause, or (b) February 15, 2010, provided that such date may be extended in the discretion of GPX as is necessary to consummate the sale of one or more business units.

130.    The breakdown of the fund is set forth in Exhibit 1 to the Incentive Program Motion.  For competitive and morale reasons, GPX has filed a motion requesting that the Court seal the identity and proposed Severance Payment to the Management Employees GPX has determined must participate in the Retention Program.

M.    **Motion by Debtor for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals.**

131.    In the *Motion by Debtor for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, GPX requests an Order to establish procedures for interim compensation and reimbursement of expenses of court-

approved professionals on a monthly basis.  GPX's estate will be liable for compensation due to

such professionals as allowed by the Court.  Such an order will enable the Court, the United

States Trustee, and other interested parties to monitor the professional fees, reduce the exposure

to the professionals, and permit GPX to maintain a more predictable cash flow.  Further, the

proposed procedures will avoid forcing the professionals to finance this bankruptcy case while

awaiting final approval of their fees and expenses.  Similar orders have been routinely granted in

other cases of this magnitude to ensure an efficient administration of the case.

132.    GPX has filed, or intends to file, applications to retain (a) Hanify & King,

Professional Corporation, as its bankruptcy counsel; (b) Hinckley, Allen & Snyder LLP, as its

special corporate counsel ; (c) Torys, LLP, as its special Canadian counsel with substantial

experience and expertise in Canadian insolvency issues, to address Canadian legal issues which

may arise due to GPX's assets and its affiliate located in Canada; (d) Argus Management

Corporation as its financial advisor; and (e) TM Capital Corp., as its investment banker.  In

addition, the United States Trustee may appoint a committee of unsecured creditors, which may

also seek to retain various professionals.

137.    Given the complex nature of this case, GPX requests that procedures be

established for compensating and reimbursing the professionals on a monthly basis that are

comparable to the procedures established in other large Chapter 11 cases in this District and

elsewhere.  Such procedures will streamline the professional compensation process and enable

the Court and all other parties to more effectively monitor the professional fees incurred in this

case.


      I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this 26th day of October, 2009.


                       /s/ Craig Steinke
                       Craig Steinke

544280



**GPX International Tire Corporation**
**Organizational Chart (as of June 30, 2009)**

# EXHIBIT B

**GPX International Tire Corporations U.S. Locations**

| ADDRESS | DESCRIPTION |
|---|---|
| **Headquarters** | |
| 730 Eastern Avenue, P.O. Box 70 Malden, MA 02148 | Worldwide Headquarters |
| | |
| **Production and Assembly Facilties** | |
| 207 Red Co Avenue, P.O. Box 110,  Red Lion, PA 17356 | Warehouse and Light Manufacturing -- Wheels |
| 9 Laurence Road Gorham, ME 04038 | Solid Tire Production Facility |
| | |
| **Warehouse and Distribution Locations** | |
| 25858 Clawiter Road, Hayward, CA 94545 | Warehouse location |
| 9700 West Wingfoot, Houston, TX 77041 | Warehouse location |
| 1247 Naperville Drive, Romeoville IL 60446 | Warehouse location |
| 1810 Brittmoore Road, Suite 100, Houston, TX 77043 | Warehouse location |
| | |
| **Retail Location** | |
| 9700-D Wallisville Road, Houston, TX 77013 | Retail and warehouse |
| | |
| **Small Offices** | |
| 5113 Highway 58, Unit 103, Harrison, TN 37416 | 1-2 person office |
| 383 Diablo Road, Suite 100, Danville, CA 94526 | 1 person office |

544301-v1