# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

|  |  |
|---|---|
| In re:  ) | |
| ) | **Chapter 11** |
| **GPX INTERNATIONAL TIRE**  ) | |
| **CORPORATION,**  ) | **Case No. 09-** |
| ) | |
| Debtor.  ) | |
| ) | |

**MOTION BY DEBTOR AND DEBTOR IN POSSESSION FOR
ORDER (A) AUTHORIZING THE SALE OF SOLID TIRE ASSETS BY
PUBLIC AUCTION, FREE AND CLEAR OF LIENS, CLAIMS AND
INTERESTS, (B) AUTHORIZING THE DEBTOR TO ASSUME
AND ASSIGN OR REJECT CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) RELATED RELIEF**

GPX International Tire Corporation (the "Debtor"), the debtor and debtor-in-possession

in the above captioned action, hereby requests an order pursuant to Sections 105, 363 and 365 of

the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.(the "Bankruptcy Code"), Rules

2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Rules 2002-1, 2002-2, 2002-4, 2002-5, 6004-1 and 9013-3 of the Local

Bankruptcy Rules of the United States Bankruptcy Court of the District of Massachusetts (the

"Local Rules") (a) authorizing the sale of certain of the Debtor's assets free and clear of liens,

claims, interests and encumbrances pursuant to public auction (the "Public Auction"), (b)

authorizing the assumption and assignment of certain executory contracts and unexpired leases in

connection with the Public Auction, and (c) for related relief.  Contemporaneously with the filing

of this motion, the Debtor has filed a motion requesting the establishment of bidding procedures

with respect to the Public Auction.

The Debtor proposes to sell by the Public Auction its (a) North American operations related to the manufacture and sale of solid and semi-solid off-the-road tire products, including its interests in its Gorham, Maine, Red Lion, Pennsylvania manufacturing facilities, and (b) the Debtor's stock in Starbright Group Inc. ("Starbright Parent"), a Cayman Islands holding company, and the parent and sole stockholder of Hebei StarbrightTire Co., Ltd. ("Starbright"), the owner of a tire manufacturing facility in Hebei Province, China (the "Solid Tire Assets", as defined below).

The Debtor's other primary business is its off highway and tire truck business (the "OTR/Truck Unit"). The Debtor proposes to sell the OTR/Truck Unit in its entirety to two separate purchasers in two separate, but interrelated, private sales (collectively the "Private Sales"). Alliance Tire Co. (1992) USA Ltd. ("Alliance") would acquire the Debtor's U.S. OTR/Truck Unit operations, including its assets, customer relationships, warehouse footprint, *Galaxy* and *Primex* brands and *Aeolus* medium radial truck tire distribution license (the "Alliance Assets"). The Debtor has also entered into an agreement with 2220753 Ontario Inc. ("Ontario"), an entity that was formed by Allegro Rubber International Inc. and Robert Sherkin and Peter Koszo, who are managers of the Debtor's indirect subsidiary, Dynamic Tire Corp.("Dynamic"), and interest holders in the Debtor, and therefore insiders as that term is defined in Section 101(31) of the Bankruptcy Code. Ontario has agreed to purchase the Debtor's stock interest in Dynamic, which (pursuant to a Supply and Distribution Agreement with the purchaser of the Alliance Assets) will continue the sale and distribution in Canada of the *Galaxy* and *Primex* brand off-the-road tires as well as the sale and distribution of medium radial truck and passenger car tires and private label sourcing. The proposed sale of Dynamic will be accomplished through the sale, free and clear of liens claims and interests, of the stock of

Dynamic's parent, 2082320 Ontario Inc. ("ExchangeCo"), a wholly owned subsidiary of the

Debtor, along with certain other assets (collectively the "Dynamic Assets").

To permit interested parties to make counter-offers for any or all of the Alliance Assets,

the Dynamic Assets and the Solid Tire Assets, the Debtor has requested that the Court establish

the same schedule for the Private Sales and the Public Auction.[1]

In support of this motion, the Debtor avers as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334 and

157.

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

3.    The statutory predicates for the relief sought in this motion are Sections 105, 363

and 365 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004, 6006,

9008 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rules 2002-1, 2002-2,

2002-4, 2002-5, 6004-1 and 9013-3.

## II.    THE PROPOSED SALE[2]

### A.    The Public Auction.

4.    The Debtor proposes that the minimum bid for the Solid Tire Assets be set at

US$9.0 million plus the assumed liabilities (described below).

---

[1] Contemporaneously with the filing of the motions requesting approval of the two sales, the Debtor has filed two corresponding motions to approve proposed bid procedures and termination fees.

[2] The descriptions of the Alliance Sale, the Dynamic Sale, the respective asset purchase agreements and related documents (collectively the "Sale Documents") are not meant to be substitutes for the Sale Documents, which contain additional terms and conditions. In the event of a conflict between this motion and the Sale Documents, the Sale Documents shall control.

5.      The Debtor requests that the Public Auction be conducted with reserve, and therefore reserves the right to reject any and all bids received at any time prior to the entry of an order approving the sale.

6.      The Debtor also reserves the right to (a) remove any asset or assets from the Public Auction at any time prior to the entry of the Solid Tire Sale Order, and (b) to modify this motion to proceed with the sale of the Solid Tire Assets by private sale in lieu of a public auction.

7.      Contemporaneously with the filing of this motion, the Debtor has filed a motion to use cash collateral in accordance with a proposed consensual cash collateral order (the "Cash Collateral Order") between the Debtor and Bank Group (as defined below).  The Cash Collateral Order provides, among other things, that upon the sale of the Solid Tire Assets, the net sale proceeds, less the Carve Out (as defined in the Cash Collateral Order) will be paid to the Bank Group on account of its secured claim.

**B.      The Solid Tire business.**

8.      In March 2006, the Debtor acquired Maine Industrial Tires Limited ('MITL"), a manufacturer of solid and semi-solid tires for materials handling equipment.  The Solid Tire business unit originated with Maine Tire, founded in 1954.

9.      In July 2006, the Debtor formed Starbright Parent to acquire Starbright.  The Debtor invested capital funds to transform Starbright's facility into a high quality production plant with production capability for pneumatic and solid tires.

10.     The Solid Tire business generated revenues in North America of $66 million in 2007, $66 million in 2008 and it is estimated to generate $45 million in 2009. The decrease in revenues is due to the recessionary climate and its impact on  industrial companies like the

-4-

Debtor. Gross margins in the Solid Tire business were approximately 20% to 28% during this time period.

11.    The Debtor manufactures solid tires through a leased facility in Gorham, Maine (the "Maine Facility") and Starbright's manufacturing facility in China.  Starbright and Maine encompass approximately 20,000 tons of annual capacity dedicated to the Solid Tire business. The Maine Facility produces tires that range from 12" – 48" OD, while Starbright is capable of producing tires that range from 12" – 88" OD.  The Maine Facility currently accounts for approximately half of the Debtor's Solid Tire business production.  It employs 65 people, operates from a leased 58,000 square foot facility, serves North America customers and is configured to accommodate short-run, just-in-time solid tires with high customization and compound additives.

12.    Starbright's state-of-the-art manufacturing facility was modernized by the Debtor to produce a full line of off the road pneumatic tires and a line of solid and large semi-solid tires, each in a discreet manufacturing building at Starbright.  The Debtor invested in new infrastructure including steam generation, power supply, plumbing, buildings and roads, which can be jointly or individually used.  Starbright is facing antidumping duties and countervailing duties (the "AD/CVD Duties") from the United States Department of Commerce.  The AD/CVD Duties only apply to pneumatic off the road tires shipped to the United States and do not apply to pneumatic tires shipped to other countries or to solid or semi-solid tires.  The Debtor has challenged the AD/CVD Duties and recently prevailed in the United States Court of International Trade.[3]  Nevertheless, the AD/CVD Duties' combined duty rates of 44 percent have rendered

---

[3]  A more detailed description of the AD/CVD Duties is included in the *Affidavit of Craig Steinke in Support of First Day Motions And Applications* (the "Steinke Affidavit").

Starbright's pneumatic production uncompetitive for serving the U.S. market through at least the end of 2010.

13.    The Debtor, as part of the pending sale of the Alliance Assets and the Dynamic Assets is obligated to enter into a non binding "off take agreement" (the "OTR") with the proposed purchasers of those assets.   Pursuant to the OTR, which is one of the "Ancillary Agreements" defined and described more fully below, Starbright would produce off the road tires servicing markets outside the United States.  This would allow the Starbright factory to have higher and more efficient manufacturing volumes that will benefit the cost of manufacturing solid and semi-solid tires at Starbright and lower the negative manufacturing variances currently being incurred.  The entire Starbright facility is capable of producing 50 tons per day of pneumatic tires and 50 tons per day of solid and semi-solid tires.

14.    The Debtor owns a steel wheel manufacturing production facility in Red Lion, Pennsylvania (the "Red Lion Facility").  It provides short-run production of steel wheels to complement short run solid tire production at the Maine Facility.  This combination provides highly-customized solutions to customers with specific wheel/solid tire assembly needs.  The facility manufactures press-on wheels and pneumatic-shaped solid products for aftermarket and OEM customers.  The facility totals 100,000 square feet.

15.    Solid tires are sold to conventional equipment applications, such as industrial fork lifts and airport ground equipment.  Semi-solid tires are sold for traditionally pneumatic equipment applications, including equipment for the construction, mining, intermodal, military, telehandler and contract utility industries.

16.    The Debtor produced a great number of new tire designs in 2008/2009, and continues to combine the benefits of solid tire technology with versatility of pneumatic tires.

These hybrid tires create "best-of-both-worlds" solutions which displace pneumatic tires in many traditional applications such as underground mining markets currently using pneumatic, foam-filled tires, heavy-haul crane equipment, recycling centers and shipping ports currently using pneumatic tires. These hybrid products combine qualities of both solid and pneumatics tires and have significantly greater life, require no filled compressed air and are not at risk of going flat.

17.    The Solid Tire business employs approximately 110 people in the United States and 20 people in Canada. Starbright employees 1,282 workers in China and is in the process of reducing this work force by approximately 500 employees. The Solid Tire business has a sales force that is strategically located throughout North America.

**C.    The Assets to be Purchased, Liabilities to be Assumed And Other Conditions.**

    **i.    Assets to be Purchased.**

18.    The assets to be purchased (collectively the "Solid Tire Assets") include the following:

    a.    Tangible and intangible assets related to the U.S. and Canadian Solid Tire business, including machinery, equipment, and other fixed assets, operating leases, real property rights, intellectual property and trade names;

    b.    Accounts receivable and inventory working capital balance for the U.S. and Canadian Solid Tire business estimated to be between $16 to $19 million at closing, subject to a working capital adjustment in accordance with the Draft APA (as defined below);

    c.    The lease, machinery, equipment and related personal property at the Maine Facility;

    d.    The real estate, machinery, equipment and related personal property located at the Red Lion Facility;

    e.    All patents, intellectual property and trademarks associated with North American Solid Tire business, including, but not limited to, ITL, MITL, Maine Tire, Brawler, and Permathane products; provided that the Debtor or its successor(s) will retain the assets, including the molds and

intellectually property rights, associated with the Galaxy and Primex brands;

f.    The issued and outstanding common shares of Starbright Parent; and

g.    The Debtor's interests in various executory contracts and unexpired leases (collectively the "Assignable Contracts").

19.    Among the assets that are not included in the Solid Tire Assets are: (a) cash, other than the working capital associated with the Solid Tire business, (b) any of the Alliance Assets, (c) any of the Dynamic Assets, (d) all intercompany receivables, and (e) any of the Debtor's rights, claims or causes of action against third parties (including any refunds, credits or rebates) arising out of the Alliance Assets and/or the Dynamic Assets, including the Debtor's causes of action under Chapter 5 of the Bankruptcy Code.[4]

**ii.    Liabilities to be Assumed.**

20.    In conjunction with the purchase of the Solid Tire Assets, potential buyers must assume certain liabilities to key vendors associated with the North American operation of the Solid Tire business, not to exceed $1.5 million, including the account payable to AirBoss of Americas in the approximate amount of $1.1 million.

21.    Starbright is a Chinese corporation with a number of liabilities, for which potential buyers will be responsible.  These liabilities include, among others:

a.    A $5.9 million loan from Bank of China;

b.    Capital expenditure payments with respect to Starbright's facility, due as of July 31, 2009, of approximately $1.3 million;

c.    Payments due to Starbright's employees under a memorandum of understanding in the approximate amount of $1.4 million,

d.    Trade payables of approximately $2.5 million, payroll liabilities, accrued expenses, warranty claims, contract and lease obligations, product liability claims, property taxes and other liabilities of Starbright.

---

[4]  Additional assets that are excluded from the sale of the Solid Tire Assets are set forth in the Draft APA.

iii.    **Other Conditions to The Sale of The Solid Tire Assets.**

22.    In conjunction with the purchase of the Solid Tire Assets, potential buyers will be required to enter into an asset purchase agreement containing the usual and ordinary terms and conditions associated with the sale of a going concern under Section 363 of the Bankruptcy Code.  Among these will be limited representations, warranties, covenants and legal closing conditions.  There will be no post-closing indemnities or escrow or holdback of cash consideration to fund indemnity claims.

23.    Potential buyers will be required to enter into various of the Ancillary Agreements, which are described below.  Potential buyers may be required to enter into other transition services agreements, the scope, duration and terms of which will be agreed upon prior to the closing of the sale of the Solid Tire Assets.

24.    Potential buyers must describe their intentions with respect to the continued employment of substantially all of the Debtor's North American Solid Tire business employees.  Starbright's workforce may be adjusted in connection with the sale of the Solid Tire Assets.

D.    **The Ancillary Agreements.**

25.    As set forth above, the Debtor has filed motions to approve the proposed sales of the Dynamic Assets and the Solid Tire Assets.

26.    Since at least July 2006, the Debtor's businesses have shared administrative functions.  Among other things, the Debtor's businesses units share supply chain and logistics services, information technology services and warranty services that are located in Dynamic's headquarters.  The Debtor's businesses units also share procurement services and warehouse space.

27.     It will take months to achieve an orderly separation of these shared functions. In order to accomplish going concern sales of the Debtor's businesses, it is necessary for the purchasers of those businesses to continue to share certain administrative functions while the orderly separation of those administrative functions is effectuated.

28.     The Alliance APA and the Dynamic APA (as defined below) therefore require the Debtor, Alliance and Ontario to enter into various agreements to insure orderly operations after the closing of the sales to the purchasers of the Alliance Assets, the Dynamic Assets and the Solid Tire Assets. Among others, the purchaser of the Dynamic Assets (the "Dynamic Purchaser") will require a license from the purchaser of the Alliance Assets (the "Alliance Purchaser") in order to sell *Galaxy* and *Primex* brand tires in Canada. The Dynamic Purchaser has agreed to provide administrative and support functions to the Alliance Purchaser for a period after the closing of the sale. Pursuant to the Alliance APA and the Dynamic APA, the foregoing agreements (collectively the "Ancillary Agreements") must be delivered at the closing of the respective sales. The Ancillary Agreements include the following:

a.      Under the Dynamic APA, Dynamic is obligated to enter into a transition services agreement (the "Dynamic Solid Tire TSA") with the Debtor. In the even that the Debtor sells the Solid Tire Assets, the Debtor expects to assign its interest in the Dynamic Solid Tire TSA to the purchaser of the Solid Tire Assets (the "Solid Tire Purchaser"). Under the Dynamic Solid Tire TSA, the Dynamic Purchaser will be obligated to provide the Debtor or, if the Solid Tire Assets is sold, the Solid Tire Purchaser with general and administrative support services, product procurement services for product procurement in China, supply chain and logistics services, information technology services, credit and collection services and warranty support services (collectively, the "Operations Services"). Dynamic will also be obligated to allow the Debtor (or the Solid Tire Purchaser) continued access and use of certain warehouse and retail service center locations located at Dynamic's Canadian facilities, and to assist the Debtor (or the Solid Tire Purchaser) with the transfer of certain employees whose duties consist in whole or in part of performing functions related to the Solid Tire Assets (the "Facilities Services"). Under the Dynamic Solid Tire TSA, Dynamic will be obligated to

continue to provide payroll processing services with respect to such employees. The Debtor (or the Solid Tire Purchaser) will reimburse Dynamic for all such direct payroll processing service costs plus an additional five percent of such amount for incidental costs associated with those employees. Dynamic will be entitled to receive a monthly fee of US$19,000 for the Operations Services, and a monthly fee of US$23,000 for the Facilities Services.

b.   The Alliance Purchaser is obligated to enter into a transition services agreement (the "Alliance Solid Tire TSA") with the Debtor. In the even that the Debtor sells the Solid Tire Assets, the Debtor expects to assign its interest in the Alliance Solid Tire TSA to the Solid Tire Purchaser. Under the Alliance Solid Tire TSA, the Alliance Purchaser will be obligated to ship certain assets related to the Solid Tire Assets located at the Memphis Facility and the warehousing and distribution facility located in Houston, Texas to the Debtor's facility located in Red Lion, Pennsylvania (the "Red Lion Facility"). The Debtor will be obligated to ship certain Alliance Assets from the Red Lion Facility to the Memphis Facility. During the term of the Alliance Solid Tire TSA, the Debtor will be obligated to provide equipment operation training to the Alliance Purchaser personnel at the Memphis Facility. The Debtor will also be obligated to continue to store wheel (rim) inventory included in the Alliance Assets that are currently located at the Red Lion Facility. The Alliance Purchaser will be obligated to provide the Debtor or the Solid Tire Purchaser (as assignee) with access to its office facilities and computer systems in Malden, Massachusetts and certain financial and accounting services for a limited transition period. The Debtor or the solid Tire Purchaser (as assignee) will be obligated to pay the Alliance Purchaser a fee of $5,000 per month for the financial and accounting services. All other services will be provided without compensation to either party.

E.   **Solicitation of Counter-Offers.**

29.   Prior to the Petition Date, the engaged TM Capital Corp. ("TM Capital"), as an investment banker, to assist the Debtor in restructuring its businesses. TM Capital worked closely with the Debtor's management to (i) analyze the current financial position of the Debtor and its business units, (ii) prepare presentation materials regarding the Debtor and its business units which could be provided to prospective purchasers, (iii) identify and contact prospective purchasers, solicit their interest, execute confidentiality agreements with such parties and circulate presentation materials, (iv) solicit and review acquisition proposals from such parties;

(v) conduct due diligence meetings with such parties, and (vi) conduct negotiations with such

parties regarding transaction value, structure and terms.  Because of competitive and disclosure

considerations, TM Capital's initial marketing efforts were focused on approximately 34 parties,

including 7 strategic and 27 financial parties.

30.     Upon approval of the bidding procedures and subject to the approval of TM

Capital's retention, TM Capital intends to market the Solid Tire Assets, the Alliance Assets and

the Dynamic Assets for bids or counter-offers, as applicable.  It is currently anticipated that this

will include contacting approximately 130 parties (inclusive of the 34 parties previously

contacted), which would include approximately 50 strategic parties and approximately 80

financial parties.

31.     A due diligence room has been established and populated with the materials that

the Debtor believes is necessary to conduct due diligence for the purposes of making counter-

offers for the Solid Tire Assets as well as the Alliance Assets and the Dynamic Assets.

Interested parties may, upon the execution of a confidentiality agreement, obtain access to the

due diligence materials.

32.     Upon the execution of a confidentiality agreement, interested parties may also

obtain a copy of the draft asset purchase agreement governing the sale of the Solid Tire Assets

(the "Draft APA") and copies of the Ancillary Agreements.

### III.     BACKGROUND[5]

33.     On October 26, 2009 ("Petition Date"), the Debtor filed a voluntary petition under

Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with this Court.

---

[5] Additional background information is contained in the Steinke Affidavit.

34.    The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code and no trustee or committee has been appointed as of the date of this motion.

35.    The Debtor was founded in 1922 as Gans Tire Salvage, originally focusing on the sale of salvaged and surplus tires. Today, the Debtor is a leading independent manufacturer and marketer of highly engineered, top quality off the road ("OTR") pneumatic (air filled), solid and semi-solid tires for agricultural, industrial and construction equipment. The Debtor sells branded tires to original equipment manufacturers (OEMs), such as Bobcat, Caterpillar, Case New Holland and John Deere, and aftermarket distributors. The Debtor also provides contract manufacturing and sourcing of branded truck and passenger tires for leading tire companies.

36.    The Debtor's facilities in the United States include the Maine Facility for solid and semi-solid tire production, a network of distribution warehouses located throughout the U.S. and several retail stores. The Debtor's Chinese subsidiary, Starbright, owns a production facility for solid, semi-solid and pneumatic OTR tires in Hebei Province, China. The Debtor has administrative, sales and warehousing facilities in Brampton, Ontario, leased by its Canadian subsidiary, and a sales, marketing and distribution office in Rodenbach, Germany operated through its German subsidiary.

37.    As of the Petition Date, the Debtor employed approximately 200 employees in the United States. The Debtor's subsidiaries employ approximately 1,300 people worldwide.

38.    For the years ending 2007 and 2008, the Debtor had net sales of, respectively, approximately $479 million and approximately $503 million. For the six months ended June 30, 2009, the Debtor had net sales of approximately $162 million.[6]

---

[6] Net sales for the years 2008 and 2009 are preliminary numbers only.

39.     The Debtor's financial difficulties arose in June 2007, when one of the Debtor's competitors and the competitor's employee union filed petitions under the Tariff Act of 1930 with the Department of Commerce (the "DOC") and the U.S. International Trade Commission (the "ITC") requesting that the DOC and ITC investigate the importation into the United States of certain pneumatic OTR tires manufactured in China. The investigations were so-called "Anti-Dumping" and "Countervailing Duty" investigations (the "AD/CVD Investigations").

40.     As a result of an adverse ruling in the AD/CVD Investigations, effective on September 2, 2008, the Debtor was required to make cash deposits with U.S. Customs equal to 43.93% of the FOB price to the Debtor on certain tires manufactured by Starbright and imported into the U.S.

41.     Due to the AD/CVD duties, the Debtor's U.S. OTR business was no longer profitable. Since the Debtor relied, in large part, on the U.S. market for sales of its OTR tire business to maintain full capacity at Starbright, underutilization of that facility has resulted in additional operating losses.

42.     At the same time, the global economic crisis was beginning, which magnified the Debtor's financial problems.

43.     On September 9, 2008, the Debtor filed three (3) complaints contesting the DOC and ITC determinations before the United States Court of International Trade (the "International Trade Court"). On September 18, 2009, the International Trade Court issued a ruling in favor of the Debtor. The International Trade Court has remanded the matter back to the DOC to remedy the DOC's AD/CVD determination. Notwithstanding the Debtor's vindication by the International Trade Court, the Debtor has been required to make the 43.93% cash deposits for

more than a year.  Due to the length of the remand process with the DOC, it does not appear that

any reduction or elimination of the AD/CVD duties will occur in the near future.

44.      From the outset of its problems with the AD/CVD duties, the Debtor and its

primary secured lender, a group of banks and other lenders (collectively the "Bank Group")

worked together to address the Debtor's financial issues.  The Bank Group is owed

approximately $120,000,000 and its claims are secured by liens on substantially all of the

Debtor's assets.

45.      In late July 2009, when it became apparent that the Debtor could not continue to

sustain its operations with its current capital structure, the Debtor determined that a sale of its

business units as going concerns was in the best interest of its creditors and parties in interest.

46.      The Debtor filed the instant Chapter 11 bankruptcy proceeding to preserve its

assets and operations for the benefit of its creditors.

## IV.    LIABILITIES[7]

47.      The chart below sets forth amounts outstanding under certain and related facilities

on or about October 23, 2009 (exclusive of interest, fees, expenses and other amounts that may

be chargeable), including amounts payable in connection with the early termination of certain

interest rate hedging contracts:

| Credit and Related Facility | Approx. Balance Due |
|---|---|
| Tranche B Term Loan | $70,419,259 |
| Tranche C Term Loan | $5,366,926 |
| Revolving Loans | $34,999,036 |

[7] The descriptions of the claims against the Debtor contained in this motion are not intended to nor may they be construed as admissions regarding such claims.  All of the Debtor's rights, claims and defenses with respect to any asserted claims are fully preserved.

-15-

| Letters of Credit | $2,992,530 |
|---|---|
| PIK Amendment and Forbearance Fees | $2,048,605 |
| Swap Termination | $6,725,754 |

A.    **Bank Group Loans.**

48.    On March 31, 2006, the Debtor entered into a credit facility provided by a group of banks (the "Bank Group") and other financial institutions led by Citizens Bank of Massachusetts (now RBS Citizens, N.A.), providing for $160.0 million in senior credit obligations comprised of a six-year $110.0 million term loan facility and a five-year $50.0 million revolving credit facility. The revolving credit facility includes up to $5.0 million in letters of credit.

49.    The Debtor's credit facility is evidenced by, among other things, a Credit and Guaranty Agreement, dated March 31, 2006, as first amended and restated on April 12, 2006, and as further amended and restated on January 30, 2008 (as amended, the "Credit Agreement"). The Credit Agreement has been amended eight times since the second amendment and restatement, the last of which occurred on August 26, 2009. Pursuant to the 2008 Amendment, Dynamic was added as a borrower under the Credit Agreement with respect to the revolving loan facility, although Dynamic's obligations are limited to amounts borrowed by it under the Credit Agreement. As of the Petition Date, Dynamic was obligated for approximately $22,700,000 under the revolving loan facility of the Credit Agreement.

50.    All of the Debtor's obligations under the Credit Agreement are secured by liens on substantially all of the Debtor's assets, including pledges of 100% of the stock in each of the Debtor's domestic subsidiaries, and 65% of the stock in each foreign subsidiary. The Debtor's

obligations under the Credit Agreement are unconditionally guaranteed by all of the Debtor's domestic subsidiaries.

51.    51.    Dynamic's obligations under the credit facility are unconditionally guaranteed by its parent, 2082320 Ontario Inc. ("ExchangeCo"), a wholly-owned subsidiary of the Debtor, and are secured by substantially all of Dynamic's and ExchangeCo's assets.

52.    Except for the Tranche C Term Loan, all loans under the Credit Agreement bear interest at a rate of LIBOR plus 8%. The Tranche C Term Loan bears interest at a rate of ten percent (10%). Availability under the revolving loan facility, whether for the Debtor or Dynamic, is based on eighty percent (80%) of their respective eligible accounts receivable and fifty percent (50%) of their respective eligible inventory.

53.    The eighth amendment to the Credit Agreement (the "8th Amendment"), among other things, provided an additional $1.0 million to the Debtor to fund operations while the Debtor was pursuing a going-concern buyer for its businesses. The 8th Amendment contained various asset sale milestones and provided a $5.0 million cap on the existing over advance under the Credit Agreement. The Bank Group's obligation to advance under the 8th Amendment expired on August 31, 2009.

54.    All of the advances under the Credit Agreement were made by members of the Bank Group, which does not include any "insiders" of the Debtor (although Sterling, as defined below, indirectly funded the Tranche C Term Loan through its purchase of a participation interest in the Tranche C Term Loan from RBS Citizens).

55.    Three investment funds managed by Sterling Investment Partners Management, LLC ("Sterling") hold a 100% participation interest in the Tranche C Term Loan. Sterling holds both unsecured subordinated debt positions and equity interests in the Debtor. The Tranche C

Term Loan was advanced under the Credit Agreement, but is a last-out tranche. The Tranche C

Term Loan bears interest at 10%, which accrues daily and compounds quarterly (no cash

payment), and matures 6 months after the maturity of the other tranches advanced under the

Credit Agreement.

**B.      Trade Debt and Other Obligations.**

56.      As of the Petition Date and excluding inter-company and insider debt, the

Debtor's non-priority unsecured debt totaled approximately $36.2 million. Of this amount,

approximately $5.2 million consisted of trade debt and $31.0 million consisted of other

unsecured obligations, such as lease obligations, accrued expenses and unsecured loan

obligations.

57.      As of the Petition Date, the Debtor owed customs duties, incurred in the ordinary

course of business of approximately $5.3 million, which may constitute a priority claim pursuant

to Section 507 of the Bankruptcy Code. The Debtor may also owe amounts, currently

undetermined, on account of the Antidumping and Countervailing Duty Investigations that may

constitute priority claims.

58.      Prior to the Petition Date, and consistent with its recent practice, the Debtor made

advance payment to employees for wages and salaries. While the Debtor does not believe that it

owes any base wages that may constitute priority claims under Section 507 of the Bankruptcy

Code, there may be amounts, accrued in the ordinary course of business, owed on account of

overtime pay, expense reimbursement, benefits and vacation and sick pay that may constitute

priority claims.

59.      Sterling holds $5.25 million of unsecured subordinated debt (the "Sterling

SubDebt") issued on February 15, 2008. The Sterling SubDebt bears interest at 9%,

compounded quarterly. All payments on the Sterling SubDebt are subordinated to payment in full of the senior obligations under the Credit Agreement.

60.    David Ganz, a former officer and shareholder and the father of Bryan Ganz, a current officer and director of the Debtor, holds an unsecured note in the approximate amount of $9.85 million (the "Ganz Note"). The Ganz Note was originally issued in 2002 and matures in 2011 on account of loans to the Debtor, and bears interest at a rate of nine percent (9%) per annum. All payments under the Ganz Note are subordinated to payment in full of the senior obligations under the Credit Agreement.

61.    Sterling's unsecured claims against the Debtor also include a $2.0 million fee for services associated with the sale of the Rumaguma subsidiary in September 2008, deferred management fees of approximately $859,000, a $1.7 million financing fee associated with the Term C Tranche Loan and various contingent "advisory" fees on account of its support and advise relating to pricing and business structure of the sale.

62.    The Debtor owes Bryan Ganz, Neil Ganz, Robert Sherkin and Peter Koszo approximately $957,000, in the aggregate, for deferred compensation from 2007. The Debtor owes Bryan and Neil Ganz approximately $858,000 and $429,000, respectively, for success fees in connection with the sale of the Rumaguma subsidiary in September 2008. Craig Steinke, the Debtor's President and Chief Executive Officer, is owed a $500,000 deferred bonus associated with the January 16, 2009 amendment to the Credit Agreement. Mr. Steinke's employment agreement also provides for a $500,000 bonus on the earliest to occur of (a) the refinancing of the senior secured credit facility, (b) a change of control and (c) March 15, 2010, unless the payment of the bonus would jeopardize the Debtor's ability to continue as a going concern in which case payment will be delayed until it would not have such effect.

C.    **Interest Holders**.

63.    The Debtor has four classes of stock: Series AA Preferred Stock, Series BB Preferred Stock, Common Stock and Special Voting Stock. Sterling holds 10,000 shares of Series AA Preferred Stock and 22,556.03 shares of Series BB Participating Preferred Stock. There are approximately 86,890 shares of Common Stock issued and outstanding and owned primarily by the Ganz family. There are approximately 79,967 shares of Special Voting Stock issued and outstanding and owned by former common stock holders of Dynamic.

64.    Both Sterling and various members of the Bank Group were issued warrants with respect to the Common Stock. Options to acquire 10,200 shares have been granted (and remain outstanding) to the Debtor employees under the Debtor's Equity Incentive Plan. All of these options have vested. Lastly, the Debtor's board of directors approved a grant of 26,737 shares of restricted stock to Craig Steinke, 50% of which vested on grant and 50% of which vested 18 months following the grant date  The grant was to be effective in February 2009 but final documents have not been executed and the shares have not yet been issued.

<div align="center">V.    <strong>R<small>EQUEST FOR</small> R<small>ELIEF</small></strong></div>

A.    **Authority to Sell Assets**.

65.    Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor requests the authority to sell the Solid Tire Assets by Public Auction free and clear of all liens, claims and interests. Except for the liabilities to be assumed in conjunction with the sale of the Solid Tire Assets, all liens and claims against or interests in the Solid Tire Assets will attach to the proceeds from the sale to the same extent, priority and validity that existed on the Petition Date.

66.    The Bankruptcy Code requires court approval for the use, sale or lease of a Debtor's assets outside the ordinary course of business. *See* 11 U.S.C. § 363. In pertinent part,

Section 363(b)(1) provides that a "trustee, after notice and a hearing, may use, sell, or lease

other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

67.     Courts have approved a sale of a debtor's assets if the proposed transaction

represents a reasonable business judgment on the part of the debtor. *See In re Martin*, 91 F.3d

389, 396 (3d Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also*

*Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Thomas McKinnon*

*Securities, Inc.*, 120 B.R 301 (Bankr. S.D.N.Y. 1990); *In re Coastal Indus., Inc.*, 63 B.R 361,367

(Bankr. N.D. Ohio 1986); *In re Baldwin United Corp.*, 43 B.R 888 (Bankr. S.D. Ohio 1984).

68.     As a result of the financial stress resulting from the combination of the AD/CVD

duties and the global recession, the Debtor concluded that it could not continue its operations

under its current capital structure. In order to preserve its operations and the jobs related to those

operations, it is necessary for the Debtor to sell its primary business units as going concerns.

Going concern sales of the Debtor's primary business units will also provide creditors an

ongoing source of new business.

69.     Absent the sale of the Solid Tire Assets and the Debtor's other business units, as

going concerns, the Debtor would likely be forced to liquidate its assets. Such a liquidation

would return a fraction of the value of the assets that would be received in a going concern sale

of the Solid Tire Assets. Moreover, the liquidation would result in the loss of the jobs associated

with the Solid Tire Assets as well as the loss of business for vendors and customers.

70.     The Debtor has concluded, in its business judgment, that the proposed sale of the

Solid Tire Assets by Public Auction will result in the best value for the Solid Tire Assets. The

sale of the Solid Tire Assets is therefore in the best interest of the Estate and its creditors, and

approval of the Sale is warranted.  *See In re Martin*, 91 F.3d 389, 396; *In re Lionel Corp.*, 722 F.2d 1063, 1070.

71.    Grounds exist to sell the Solid Tire Assets because the holders of interests in the Solid Tire Assets either consent to the sale or "may be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." *See* 11 U.S.C. § 363(f)(5).

72.    The Debtor requests that the Court waive the ten (10) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(g).

**B.    Authority to Assume/Reject Executory Contracts And Unexpired Leases.**

73.    Subject to court approval, Section 365(a) of the Bankruptcy Code authorizes a trustee to assume and assign or reject an executory contract or unexpired lease. *See* 11 U.S.C. § 365(a).  The standard for determining whether an executory contract or unexpired lease should be assumed or rejected is the "business judgment" test. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional").

74.    Upon finding that a trustee has exercised sound business judgment in determining that the assumption or rejection is in the best interests of its estate, the court should approve the assumption or rejection under Section 365(a) of the Bankruptcy Code. *See, e.g., In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990).

75.    In order to close on the sale of the Solid Tire Assets, it will be necessary for the Debtor to either assume and assign or to reject the Assignable Contracts.  The Debtor is requesting the authority to assume and assign and/or reject the Assignable Contracts only in the event that the sale of the Solid Tire Assets closes.

76.     As is described above, the sale of the Solid Tire Assets by Public Auction is in the best interest of the Debtor, its creditors and parties in interest.  Because the assumption and assignment and/or rejection of the Assignable Contracts is necessary for the consummation of the sale of the Solid Tire Assets, the Debtor has determined, in its business judgment, that such assumption and assignment and/or rejection is also in the best interest of the Debtor, its creditors and parties in interest.

77.     The assumption and assignment and/or Assignable Contracts is therefore warranted pursuant to Section 365(a) of the Bankruptcy Code.  *See In re Orion Pictures Corp.*, 4 F.3d at 1098.

## VI.   NOTICE

78.     The Debtor has served this motion on the Office of the United States Trustee, all of the Debtor's secured creditors, the Debtor's twenty (20) largest creditors and all parties having filed a notice of appearance in the above captioned case.

79.     Contemporaneously with the filing of this motion, the Debtor has filed a motion to establish notice procedures and approve a form of notice of sale (the "Notice Motion").  The Debtor will serve this motion in accordance with any order entered by the Court with respect to the Notice Motion.

80.     The Debtor submits that such service is appropriate given the nature of the relief requested in this motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter and order: (a) approving this motion, (b) authorizing the sale of the Solid Tire Assets by public auction with reserve, (c) Authorizing the Debtor to take the steps necessary to the effectuate the asset purchase agreement to be entered into in conjunction with the sale of the Solid Tire Assets, (d)

authorizing the Debtor to assume the executory contracts and unexpired leases necessary to close

the sale of the Solid Tire Assets, (e) authorizing the Debtor to reject any executory contracts and

unexpired leases to the extent necessary to close the sale of the Solid Tire Assets, (f) waiving the

stay provisions of Federal Rule of Bankruptcy Procedure 6004(g), and (g) granting such other

relief as this Court deems proper.

<div style="margin-left:40%">

Respectfully Submitted,

GPX INTERNATIONAL TIRE CORPORATION
By its proposed counsel,


 /s/ Harold B. Murphy
Harold B. Murphy (BBO #362610)
D. Ethan Jeffery (BBO #631941)
Natalie B. Sawyer (BBO #660072)
HANIFY & KING, P.C.
One Beacon Street
Boston, MA  02108-3107
Tel: (617) 423-0400
Fax: (617) 556-8985
dej@hanify.com

</div>

Dated: October 26, 2009
::ODMA\PCDOCS\DOCS\544282\1