## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Eastern Division)

|  |  |  |
|---|---|---|
| **In re:** | ) | |
| | ) | **Chapter 11** |
| **GPX INTERNATIONAL TIRE** | ) | |
| **CORPORATION** | ) | |
| | ) | **Case No.  09-20170-JNF** |
| **Debtor** | ) | |
| | ) | |

### DEBTOR'S MOTION (A) TO AUTHORIZE DEBTOR TO EFFECTUATE PURCHASE AND SALE AGREEMENT WITH MITL ACQUISITION COMPANY, LLC; (B) TO AUTHORIZE SALE OF SOLID TIRE ASSETS BY PRIVATE SALE FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS; (C) TO AUTHORIZE THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, (D) TO AUTHORIZE THE REJECTION OF EXECUTORY CONTRACTS, AND (E) FOR RELATED RELIEF

GPX International Tire Corporation  (the "Debtor"), the debtor and debtor-in-possession

in the above captioned bankruptcy proceeding, hereby moves this Court, pursuant to Sections

105, 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.(the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 2002-2, 2002-4, 2002-5,

6004-1 and 9013-3 of the Local Bankruptcy Rules of the United States Bankruptcy Court of the

District of Massachusetts (the "Local Rules"), for the entry of an order (a) authorizing the Debtor

to effectuate the asset purchase agreement (the "Solid Tire APA") with MITL Acquisition

Company, LLC ("MITL"),[1] (b) authorizing the sale of certain of the Debtor's assets related to its

solid and semi-solid off-the-road tire products, including its Gorham, Maine, Red Lion,

Pennsylvania and Hebei, China manufacturing facilities, and all other items defined as

"Purchased Assets" or "Purchased Contracts" under the Solid Tire APA (collectively the "Solid

Tire Assets"), by private sale free and clear of all liens, claims and interests, (c) authorizing the

Debtor to assume and assign certain executory contracts in conjunction with the proposed sale,

(d) authorizing the Debtor to reject certain executory contracts in conjunction with the proposed

sale, and (e) for related relief.[2]  Except for those liabilities of the Debtor assumed by MITL, all

liens, claims and interests shall attach to the proceeds from the proposed sale to the same extent,

priority and validity that existed on the Petition Date (as defined below).

The Debtor has filed a motion for authority to sell the Solid Tire Assets by public auction

[docket no. 10] so that the Solid Tire Assets would be available for purchase in conjunction with

the proposed sale of the Debtor's off highway and tire truck business (the "OTR/Truck Unit"),

which is being sold in two separate, but interrelated, transactions to Alliance Tire Co. (1992)

USA Ltd. ("Alliance") and 2220753 Ontario Inc. ("Ontario").  Pursuant to the bid procedures

approved by the Court, the minimum bid at public auction for the Solid Tire Assets is

$9,000,000.  MITL has offered $10,000,000 for the Solid Tire Assets and has executed the Solid

Tire APA.  The MITL offer provides the Debtor's bankruptcy estate with a certain recovery for

the Solid Tire Assets and also provides the estate and prospective purchasers, through the Solid

Tire APA, with a definitive agreement that will govern the terms of the sale of the Solid Tire

Assets.  Accordingly, the Debtor has filed a separate motion requesting, among other things, (a)

the approval of MITL as a stalking horse, (b) the approval of a termination fee for MITL, and (c)

the modification of the previously established public auction procedures for the sale of the Solid

Tire Assets.

---

[1]  As is described in paragraphs 13 and 14 below, MITL is an insider of the Debtor inasmuch as certain of the investors in MITL are insiders of the Debtor.
[2]  Capitalized terms not otherwise defined in this motion shall have the meanings ascribed to them in the Solid Tire APA.

The Debtor's primary secured creditor, a group of banks and other lenders (collectively the "Bank Group") consents to the sale of the Solid Tire Assets pursuant to the Solid Tire APA and this motion.

In further support of this Motion, the Debtor avers as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 1334 and 157.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

3.     The statutory predicates for the relief sought in this motion are Sections 105, 363 and 365 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 2002, 6004, 6006, 9008 and 9014 and Local Rules 2002-1, 2002-2, 2002-4, 2002-5, 6004-1 and 9013-3.

## II.     THE PROPOSED SALE[3]

4.     Subject to the approval of the United States Bankruptcy Court for the District of Massachusetts (the "Court"), the Debtor entered into the Solid Tire APA with MITL. A copy of the Solid Tire APA is attached as Exhibit A.

**A.     The Purchase Price And The Assets to be Purchased.**

5.     The purchase price for the Solid Tire Assets is $10,000,000 (the "Solid Tire Purchase Price"). MITL is also assuming certain designated liabilities, currently estimated at approximately $1,300,000 (the "Assumed Liabilities"). The Solid Tire Purchase Price is subject to a dollar for dollar reduction to the extent that the aggregate costs to cure arrearages under the

---

[3] The descriptions of the proposed sales to MITL, Alliance and Dynamic, and the respective asset purchase agreements and related documents, including the Solid Tire APA (collectively the "Sale Documents"), are not meant to be substitutes for the Sale Documents, which contain additional terms and conditions. In the event of a conflict between this motion and the Sale Documents, the Sale Documents shall control.

contracts to be assumed by MITL exceed $500,000. MITL has made a good faith deposit of

$450,000. The Solid Tire APA provides that MITL is entitled to either (a) up to $350,000 of

MITL's reasonable, documented out-of-pocket expenses (the "Expense Reimbursement") or (b)

a termination fee of $350,000 (the "Break-up Fee", and together with the Expense

Reimbursement, the "Termination Fee"). The Termination Fee is subject to Court approval and

payable: (a) in the event a competing transaction is consummated resulting in the sale of the

Solid Tire Assets to a third party, or (b) in certain circumstances, in the event of the termination

of the Solid Tire APA.[4]

6.    On October 27, 2009, the Court entered an interim cash collateral order [docket

no. 40](the "Cash Collateral Order") that had been agreed to between the Debtor and Bank

Group (as defined below). The Cash Collateral Order provides, among other things, that upon

the sale of the Solid Tire Assets, the net sale proceeds, less the Carve Out (as defined in the Cash

Collateral Order) will be paid to the Bank Group on account of its secured claim. A final hearing

on the approval of the Cash Collateral Order is scheduled for November 18, 2009.

7.    The Solid Tire Assets include, among other things, the following:

a.    The personal property associated with the production of solid and semi-solid off-the-road tires, including machinery and equipment, molds, tooling, bead rings, exchangeable plates, software, intellectual property (including patents, trademarks and copyrights), and permits;

b.    Accounts receivable associated with the Solid Tire Assets;

c.    Causes of action against third parties arising out of the Solid Tire Assets;

d.    The stock in Starbright Group, Inc. ("Starbright Group"); and

e.    The Debtor's real property, along with all improvements, located in Red Lion, Pennsylvania.

---

[4] The Termination Fee is described more fully in the Notice Motion (as defined in paragraph 82), filed contemporaneously with this motion.

8.      The Solid Tire Assets do not include, among other things:

   a.      Any cash or cash equivalents;

   b.      Shares of capital stock or equity interests in any subsidiary of the Debtor other than Starbright Group, Inc. and Hebei Starbright Tire Co., Ltd ("Hebei Starbright, and together with Starbright Group, Inc. the "Included Subsidiaries");

   c.      All of the Debtor's assets other than the Solid Tire Assets, including (i) the Alliance Assets, (ii) the Dynamic Assets, and (iii) any business conducted by the Debtor's subsidiaries other than the Included Subsidiaries;

   d.      Other than with respect to the Solid Tire Assets or Assumed Liabilities, rights, claims or causes of action against third parties (other than certain intellectual property litigation), including any refunds, credits and rebate arising from the Solid Tire business prior to the closing or the OTR/Truck Unit; and

   e.      Any contract or permit relating to the Solid Tire Assets that requires the consent of a third party to be assumed and assigned which has not been obtained by virtue of the order of the Court or otherwise.

9.      In connection with the purchase of the Solid Tire Assets, MITL has agreed to assume certain of the Debtor's liabilities related to the Solid Tire Assets including the following:

   a.      Liabilities, including product warranties, product returns, customer programs, credits and rebates under contracts constituting part of the Solid Tire Assets;

   b.      Certain trade payables to critical vendors;

   c.      Liabilities arising under the Consolidated Omnibus Budget Reconciliation Act in respect of employees hired by MITL and certain of the Debtor's employees terminated during the twelve (12) months prior to the closing;

   d.      Cure amounts under certain contracts constituting Solid Tire Assets, up to an aggregate amount of $500,000.

10.     Except for those liabilities specifically assumed by MITL, the Solid Tire APA requires that the Debtor deliver the Solid Tire Assets free and clear of liens, claims and interests pursuant to Section 363 of the Bankruptcy Code.

11.     The Solid Tire APA provides for the setoff and/or release of certain intercompany accounts among the Included Subsidiaries and the Debtor and/or any of the Debtor's other subsidiaries (the "Excluded Subsidiaries"). In the event that MITL does not acquire intercompany accounts owed by the Included Subsidiaries to the Debtor, Section 7.10(a) of the Solid Tire APA provides MITL with the option of either (a) requiring that the cash purchase price be used to pay down such intercompany account, or (b) requiring the Debtor to convert the intercompany account into stock in the Included Subsidiary and transfer such new stock to MITL free of liens, claims and interests.

12.     Section 7.10(b) of the Solid Tire APA provides that, in the event that, after giving effect to Section 7.10(a) there are intercompany accounts between the Included Subsidiaries and/or the Debtor and the Excluded Subsidiaries, such intercompany accounts will be setoff against each other or released.

13.     MITL may terminate the Solid Tire APA if, among other things, the sale of the Alliance Assets is not consummated by January 15, 2010.

**B.      The Ganz Family.**

14.     MITL was formed, in part, by Bryan Ganz, Neil Ganz and David Ganz, each of whom is an insider of the Debtor.

15.     Bryan Ganz is an officer, director, shareholder and creditor of the Debtor. Neil Ganz is a shareholder, a creditor and an employee of the Debtor. David Ganz is a creditor and an employee of the Debtor. Bryan Ganz, Neil Ganz and David Ganz are all related.

**C.      Conditions to Closing.**

16.     The consummation of the proposed sale to MITL is conditioned, among other things, on:

6

a.  The entry of a bid procedures order and approval of the proposed sale by the Bankruptcy Court;

b.  The assumption and assignment of the Assumed Contracts (as defined below) and the rejection of the Terminated Contracts (as defined below);

c.  The delivery of the Ancillary Agreements (as defined below) related to the Solid Tire Assets;

d.  A five year, royalty free limited license to use Debtor's name and logo on products solely with respect to those products utilizing molds included as Solid Tire Assets incorporating such name and logo as of the date of the Solid Tire APA; and

e.  Stock certificates for the Starbright Group.

**D.     The Ancillary Agreements.**

17.    As set forth above, the Debtor has filed motions to approve the proposed sales of the Alliance Assets and the Dynamic Assets.

18.    Since at least July 2006, the Debtor's businesses have shared administrative functions. Among other things, the Debtor's businesses units share supply chain and logistics services, information technology services and warranty services that are located in Dynamic's headquarters. The Debtor's businesses also share procurement services and warehouse space.

19.    It will take months to achieve an orderly separation of these shared functions. In order to accomplish going concern sales of the Debtor's businesses, it is necessary for the purchasers of those businesses to continue to share certain administrative functions while the orderly separation of those administrative functions is effectuated.

20.    The Alliance APA and the Dynamic APA (as defined below) therefore require the Debtor, Alliance and Ontario to enter into various agreements to insure orderly operations after the closing of the sales to the purchasers of the Alliance Assets, the Dynamic Assets and the Solid Tire Assets. Among others, the purchaser of the Dynamic Assets (the "Dynamic

Purchaser") will require a license from the purchaser of the Alliance Assets (the "Alliance

Purchaser") in order to sell *Galaxy* and *Primex* brand tires in Canada. The Dynamic Purchaser

has agreed to provide administrative and support functions to the Alliance Purchaser for a period

after the closing of the sale. Pursuant to the Alliance APA and the Dynamic APA, the foregoing

agreements (collectively the "Ancillary Agreements") must be delivered at the closing of the

respective sales. The Ancillary Agreements include the following:

a.   In connection with the Dynamic APA, the Debtor will enter into a supply
and distribution agreement (the "Supply and Distribution Agreement")
with Dynamic, which is assignable to the Alliance Purchaser or, with the
consent of the Dynamic Purchaser, another purchaser of the OTR/Truck
Unit. Pursuant to the Supply and Distribution Agreement, the Alliance
Purchaser (as assignee) will grant an exclusive 10-year distribution license
to Dynamic for the distribution of *Galaxy* and *Primex* brand tires in
Canada. The price for products to be supplied under this license which are
purchased from third party vendors will be the price charged to the
Alliance Purchaser by such third party vendor(s), or if the products are
manufactured at the Alliance Purchaser's own manufacturing facilities
shall be a function of existing third-party pricing by the Alliance
Purchaser, with a price escalation mechanism to reflect changes in raw
material and mark-based conversion costs The license will be subject to
termination in the event Dynamic does not achieve certain annual
minimum volume requirements as set forth in the Supply and Distribution
Agreement. Dynamic will be obligated under the Supply and Distribution
Agreement to continue to provide the Alliance Purchaser with assistance
and services for the sourcing of *Galaxy* and *Primex* brand tires from third-
party suppliers on the best available pricing, terms and quality. Dynamic
will also grant the Alliance Purchaser with a non-exclusive, royalty-free
license to use certain *Dynamo* brand-related trademarks in connection with
the manufacture, promotion, advertisement and sale of certain *Dynamo*-
branded tire products for a one-year period.

b.   In connection with the Dynamic APA, Dynamic is obligated to enter into
a Transition Services Agreement (the "OTR TSA") with the Debtor. The
OTR TSA is assignable by the Debtor to the Alliance Purchaser or, with
the consent of the Dynamic Purchaser, another purchaser of the Alliance
Assets. Under the OTR TSA, Dynamic will be obligated to provide
certain supply chain and logistics services, information technology
services, and warranty services to the Debtor or the Alliance Purchaser (as
assignee). In addition, Dynamic will be obligated to provide the Debtor or
the Alliance Purchaser (as assignee) access to and use of the facility

located at 510 35th North, Birmingham, Alabama (the "Birmingham Lease"), in exchange for which the Alliance Purchaser will assume Dynamic's obligations under the lease for that facility. Dynamic will also provide the Debtor or the Alliance Purchaser (as assignee) with warehousing and inventory management services at the located at 510 35th North, Birmingham, Alabama. Under the OTR TSA, Dynamic will be entitled to a fee of $125,000 per month for a minimum of six months. Following the first twelve months, this fee will increase to $250,000 per month. The OTR TSA will be terminable by Dynamic 18 months following the closing of the transaction contemplated by the Dynamic APA.

c.      Under the Dynamic APA, Dynamic is obligated to enter into a transition services agreement (the "Dynamic Solid Tire TSA") with the Debtor. In the event that the Debtor sells the Solid Tire Assets, the Debtor expects to assign its interest in the Dynamic Solid Tire TSA to the purchaser of the Solid Tire Assets (the "Solid Tire Purchaser"). Under the Dynamic Solid Tire TSA, the Dynamic Purchaser will be obligated to provide the Debtor or, if the Solid Tire Assets are sold, the Solid Tire Purchaser with general and administrative support services, product procurement services for product procurement in China, supply chain and logistics services, information technology services, credit and collection services and warranty support services (collectively, the "Operations Services"). Dynamic will also be obligated to allow the Debtor (or the Solid Tire Purchaser) continued access and use of certain warehouse and retail service center locations located at Dynamic's Canadian facilities, and to assist the Debtor (or the Solid Tire Purchaser) with the transfer of certain employees whose duties consist in whole or in part of performing functions related to the Solid Tire Assets (the "Facilities Services"). Under the Dynamic Solid Tire TSA, Dynamic will be obligated to continue to provide payroll processing services with respect to such employees. The Debtor (or the Solid Tire Purchaser) will reimburse Dynamic for all such direct payroll processing service costs plus an additional five percent of such amount for incidental costs associated with those employees. Dynamic will be entitled to receive a monthly fee of US$19,000 for the Operations Services, and a monthly fee of US$23,000 for the Facilities Services.

d.      The Alliance Purchaser is obligated to enter into a transition services agreement (the "Alliance Solid Tire TSA") with the Debtor. In the event that the Debtor sells the Solid Tire Assets, the Debtor expects to assign its interest in the Alliance Solid Tire TSA to the Solid Tire Purchaser. Under the Alliance Solid Tire TSA, the Alliance Purchaser will be obligated to ship certain assets related to the Solid Tire Assets located at the Memphis Facility and the warehousing and distribution facility located in Houston, Texas to the Debtor's facility located in Red Lion, Pennsylvania (the "Red

Lion Facility"). The Debtor will be obligated to ship certain Alliance Assets from the Red Lion Facility to the Memphis Facility. During the term of the Alliance Solid Tire TSA, the Debtor will be obligated to provide equipment operation training to the Alliance Purchaser personnel at the Memphis Facility. The Debtor will also be obligated to continue to store wheel (rim) inventory included in the Alliance Assets that are currently located at the Red Lion Facility. The Alliance Purchaser will be obligated to provide the Debtor or the Solid Tire Purchaser (as assignee) with access to its office facilities and computer systems in Malden, Massachusetts and certain financial and accounting services for a limited transition period. The Debtor or the solid Tire Purchaser (as assignee) will be obligated to pay the Alliance Purchaser a fee of $5,000 per month for the financial and accounting services. All other services will be provided without compensation to either party.

e.    The Alliance Purchaser is obligated to enter into an Access and Use Agreement (the "Access and Use Agreement") with the Debtor. Under the Access and Use Agreement, the Alliance Purchaser will be obligated to provide access to the Malden Facility, use of the Alliance Purchaser's computer systems and general and administrative support for the wind-down of the Debtor's business at no additional cost. The term of the Access and Use Agreement will be nine (9) months, subject to earlier termination if the Alliance Purchaser terminates its lease of the Malden Facility.

f.    The Alliance Purchaser is obligated to enter into an Off-Take Agreement (the "Off-Take Agreement") with Hebei Starbright, the direct subsidiary of Starbright Group, related to tire production at the manufacturing facility owned by Hebei Starbright.

## E.    Inter-Company Transactions.

21.    Prior to the Petition Date, certain assets (collectively the "Excluded Assets") that are used in the operation of the Alliance Assets or the Solid Tire Assets were transferred from Dynamic to the Debtor for inclusion in the Alliance Assets or the Solid Tire Assets. The Excluded Assets included (a) certain solid tire intellectual property (trademark and patents), (b) OEM and aftermarket intellectual property (the *Primex* trademark and patent), (c) certain molds related to the Alliance Assets and the Solid Tire Assets, and (d) certain solid tire inventory and receivables.

22.     Prior to the Petition Date, the Debtor and its subsidiaries had inter-company obligations owing to and from each other.  In order to facilitate the sales of the Alliance Assets and the Dynamic Assets and to address tax issues, various intercompany obligations were adjusted prior to the Petition Date, including the following:

a.     The assignment by the Debtor of US$17 million (out of a total of approximately US$32.9 million (including $7.0 million of accrued interest) of a loan due to the Debtor by Dynamic (the "Dynamic Loan") to the Debtor's wholly-owned subsidiary, Starbright Group, Inc. ("CaymanCo"), the parent of Hebei Starbright Tire Co., Ltd. ("Starbright China").  This assignment (the "Assigned Note Receivable") was in exchange for a demand note in the principal amount of US$17 million.

b.     The purchase by CaymanCo from Dynamic of a US$17 million note payable (the "Starbright Loan") due to Dynamic from Starbright China through the assignment of the US$17 million Assigned Note Receivable back to Dynamic.

c.     The offset by the Debtor and Dynamic of a US$6.7 million trade receivable due to Dynamic from the Debtor in satisfaction of approximately US$7.0 million of interest due the Debtor on the Dynamic Loan.  In conjunction with this transaction, Dynamic is responsible for remitting four percent (4%) of the setoff amount (approximately CAN $293,000) to the Canada Revenue Agency in respect of the resulting Canadian nonresident withholding tax payable by the Debtor resulting from such set off.

d.     The transfer by Dynamic of the Excluded Assets, with an aggregate value of approximately US$3.63 million, in partial satisfaction of the US$9.2 million remaining balance of the Dynamic Loan due to the Debtor, thereby reducing the Dynamic Loan balance to approximately US$5.6 million.

## F.     Executory Contracts And Unexpired Leases to be Assumed or Rejected.

23.     The Solid Tire APA requires the Debtor to seek to assume and assign to MITL certain executory contracts and unexpired leases (the "Assumed Contracts").

24.     In conjunction with the proposed sale of the Solid Tire Assets by public auction, the Debtor previously obtained approval for: (a) notice to counter-parties of the Assumed

Contracts of the assumption and assignment of the Assumed Contracts, (b) notice of the

proposed cure amounts with respect to the Assumed Contracts (the "Cure Amounts"), and (c)

notice of the objection deadlines with respect to the proposed Cure Amounts. The *Motion by*

*Debtor to (A) Amend Bid Procedures Order, (B) Approve Termination Fee in Connection With*

*Private Sale of Solid Tire Assets, (C) Establish Hearing Date And Related Deadlines For*

*Proposed Sale, And (D) Approve Form And Manner of Service*, filed contemporaneously with

this motion, does not request any modification of those procedures. Under the Solid Tire APA,

MITL will pay up to $500,000 of the Cure Amounts, as finally allowed by the Court, at closing.

25.    Pursuant to the Solid Tire APA, the Debtor must reject: (a) the production

agreement between the Debtor and Hebei Starbright dated January 1, 2008, and (b) the

development agreement between the Debtor and Hebei Starbright dated January 2, 2008

(collectively the "Terminated Contracts"). The Debtor must also obtain a release of the

production agreement between Dynamic and Hebei Starbright dated January 1, 2008.

**G.    Solicitation of Counter-Offers.**

26.    Prior to the Petition Date, the Debtor engaged TM Capital Corp. ("TM Capital"),

as an investment banker, to assist the Debtor in restructuring its businesses. TM Capital worked

closely with the Debtor's management to (i) analyze the current financial position of the Debtor

and its business units, (ii) prepare presentation materials regarding the Debtor and its business

units which could be provided to prospective purchasers, (iii) identify and contact prospective

purchasers, solicit their interest, execute confidentiality agreements with such parties and

circulate presentation materials, (iv) solicit and review acquisition proposals from such parties;

(v) conduct due diligence meetings with such parties, and (vi) conduct negotiations with such

parties regarding transaction value, structure and terms. Because of competitive and disclosure

considerations, TM Capital's initial marketing efforts were focused on approximately 34 parties, including 7 strategic and 27 financial parties.

27.     After the entry of the Court's order approving bidding procedures with respect to the proposed sales of the Alliance Assets and the Dynamic Assets, TM Capital commenced and is continuing a broader marketing program for the Debtor and its business units to seek higher and better offers. It is currently anticipated that this program will include approximately 130 parties (inclusive of the 34 parties previously contacted), which would include approximately 50 strategic parties and approximately 80 financial parties.

28.     A due diligence room has been established and populated with the materials that the Debtor believes is necessary to conduct due diligence for the purposes of making counter-offers. Interested parties may, upon the execution of a confidentiality agreement, obtain access to the due diligence materials.

## H.     The Alliance Sale.[5]

29.     The purchase price for the Alliance Assets is US$38,300,000 (the "Alliance Purchase Price"), consisting of (a) US$33,000,000 in cash, and (b) the assumption by Alliance of certain liabilities in an amount estimated at US$5,300,000 (the "Assumed Liabilities"). The Alliance Purchase Price is subject to a dollar for dollar working capital adjustment to the extent that the net working capital at closing is greater or less than US$27,900,000. Alliance has made a good faith deposit of US$1,000,000. The Alliance APA provides that Alliance is entitled to a termination fee of US$900,000 (the "Fee") plus up to US$1,000,000 of Alliance's reasonable,

---

[5] A full description of the proposed sale of the Alliance Assets is included in the *Debtor's Motion (A) to Authorize Debtor to Effectuate Asset Purchase Agreement With Alliance Tire Co. (1992) USA Ltd.; (B) to Authorize Sale of Certain of The Debtor's Assets by Private Sale Free And Clear of Liens, Claims And Interests; (C) to Authorize The Assumption And Assignment of Executory Contracts, (D) to Authorize The Rejection of Executory Contracts, And (E) For Related Relief,* filed contemporaneously with this motion.

documented out-of-pocket expenses incurred in connection with the Alliance APA (collectively the "Termination Fee").  The Termination Fee is subject to Court approval and payable: (a) in the event a competing transaction is consummated resulting in the sale of the Alliance Assets to a third party, or (b) in certain circumstances, in the event of the termination of the Alliance APA.[6]

30.   Except for those liabilities specifically assumed by Alliance, the Alliance APA requires that the Debtor deliver the Alliance Assets free and clear of liens, claims and interests pursuant to Section 363 of the Bankruptcy Code, including any anti-dumping or countervailing duty orders on imports of off-the-road tires from China prior to the closing.

31.   Alliance may terminate the Alliance APA if, among other things, the sale of the Alliance Assets is not consummated by December 31, 2009.

Contemporaneously with the filing of this motion, the Debtor has filed a motion to use cash collateral in accordance with a proposed consensual cash collateral order (the "Cash Collateral Order") between the Debtor and Bank Group (as defined below).  The Cash Collateral Order provides, among other things, that upon the sale of the Alliance Assets, the net sale proceeds, less the Carve Out (as defined in the Cash Collateral Order) will be paid to the Bank Group on account of its secured claim.

## I.    The Dynamic Sale.[7]

32.   Prior to the Petition Date, the Debtor entered into a Stock Purchase Agreement (the "Dynamic APA") with Ontario, Robert G. Sherkin ("Sherkin") and Peter Koszo ("Koszo"),

---

[6] The Termination Fee is described more fully in the *Motion by Debtor For Approval of Bidding Procedures And Termination Fee Provision in Connection With Debtor's Motion to Authorize Sale of Certain of The Debtor's Assets to Alliance Tire Co. (1992) USA Ltd. by Private Sale Free And Clear of Liens, Claims And Interests*, filed contemporaneously with this motion.

[7] A full description of the proposed Dynamic sale is included in the *Debtor's Motion (A) to Authorize Debtor to Effectuate Stock Purchase Agreement With 2220753 Ontario Inc.;(B) to Authorize Sale of Certain of The Debtor's Assets by Private Sale Free And Clear of Liens, Claims And Interests; And (C) For Related Relief* (the "Dynamic Sale Motion"), filed contemporaneously with this motion.

pursuant to which Ontario has agreed to acquire the Dynamic Assets through the purchase of the

stock of Dynamic's parent corporation. The Dynamic Assets, which are owned by Dynamic,

consist of, among other things (a) the distribution rights of *Galaxy* and *Primex* brand tires in

Canada, (b) the manufacture and distribution of Dynamo brand tires worldwide, (c) the private

label contract sourcing business for TBC Corporation and (d) the sourcing business for Interco

Tire Corporation with respect to all terrain vehicle tires. Sherkin and Koszo are insiders of the

Debtor.

33.     Dynamic will be acquired through the purchase by Ontario of all the issued and

outstanding shares of capital stock (the "ExchangeCo Shares") of 2082320 Ontario Inc., an

Ontario corporation and wholly-owned subsidiary of the Debtor (the "ExchangeCo").

ExchangeCo is the owner of 34,270 shares of common stock of Dynamic.

34.     The purchase price for the ExchangeCo Shares is approximately US$23,915,000,

plus an amount equal to all cash and cash equivalents of Dynamic, less Dynamic's secured

obligations to the Bank Group. These secured obligations are guaranteed by the Debtor. The

purchase price is further subject to a working capital adjustment to the extent net working capital

at closing is greater or less than C$23,000,000 (Canadian dollars).

35.     The Debtor is seeking and will continue to seek offers for the purchase of the

Alliance Assets, the Dynamic Assets and the Solid Tire Assets.

## III.     BACKGROUND[8]

### A.     General Background.

36.     On October 26, 2009 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code in the Court.

---

[8] Additional background information is contained in the *Affidavit of Craig Steinke in Support of First Day Motions And Applications* (the "Steinke Affidavit"), which is incorporated herein by reference.

37.    The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Code. On or about November 6, 2009, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").

38.    The Debtor was founded in 1922 as Gans Tire Salvage, originally focusing on the sale of salvaged and surplus tires. Today, the Debtor is a leading independent manufacturer and marketer of highly engineered, top quality off the road ("OTR") pneumatic (air filled), solid and semi-solid tires for agricultural, industrial and construction equipment. The Debtor sells branded tires to original equipment manufacturers (OEMs), such as Bobcat, Caterpillar, Case New Holland and John Deere, and aftermarket distributors. The Debtor also provides contract manufacturing and sourcing of branded truck and passenger tires for leading tire companies.

39.    The Debtor's facilities in the United States include a production facility for solid and semi-solid tires in Gorham, Maine, a network of distribution warehouses located throughout the U.S. and several retail stores. Starbright operates a production facility for solid, semi-solid and pneumatic OTR tires in Hebei Province, China. The Debtor has administrative, sales and warehousing facilities in Brampton, Ontario, leased by its Canadian subsidiary, and a sales, marketing and distribution office in Rodenbach, Germany operated through its German subsidiary.

40.    As of the Petition Date, the Debtor employed approximately 200 employees in the United States. The Debtor's subsidiaries employ approximately 1,300 people worldwide.

41.    For the years ending 2007 and 2008, the Debtor had net sales of, respectively, approximately $479 million and approximately $503 million. For the six months ended June 30, 2009, the Debtor had net sales of approximately $162 million.[9]

---

[9] Net sales for the years 2008 and 2009 are preliminary numbers only.

42.     The Debtor's financial difficulties arose in June 2007, when one of the Debtor's competitors and the competitor's employee union filed petitions under the Tariff Act of 1930 with the Department of Commerce (the "DOC") and the U.S. International Trade Commission (the "ITC") requesting that the DOC and ITC investigate the importation into the United States of certain pneumatic OTR tires manufactured in China. The investigations were so-called "Anti -Dumping" and "Countervailing Duty" investigations (the "AD/CVD Investigations").

43.     As a result of an adverse ruling in the AD/CVD Investigations, effective on September 2, 2008, the Debtor was required to make cash deposits with U.S. Customs equal to 43.93% of the FOB price to the Debtor on certain tires manufactured by Starbright and imported into the U.S.

44.     Due to the AD/CVD duties, the Debtor's U.S. OTR business was no longer profitable. Since the Debtor relied, in large part, on the U.S. market for sales of its OTR tire business to maintain full capacity at Starbright, underutilization of that facility has resulted in additional operating losses.

45.     At the same time, the global economic crisis was beginning, which magnified the Debtor's financial problems.

46.     On September 9, 2008, the Debtor filed three (3) complaints contesting the DOC and ITC determinations before the United States Court of International Trade (the "International Trade Court"). On September 18, 2009, the International Trade Court issued a ruling in favor of the Debtor. The International Trade Court has remanded the matter back to the DOC to remedy the DOC's AD/CVD determination. Notwithstanding the Debtor's vindication by the International Trade Court, the Debtor has been required to make the 43.93% cash deposits for

more than a year.  Due to the length of the remand process with the DOC, it does not appear that any reduction or elimination of the AD/CVD duties will occur in the near future.

47.     From the outset of its problems with the AD/CVD duties, the Debtor and its primary secured lender, a group of banks and other lenders (collectively the "Bank Group") worked together to address the Debtor's financial issues.  The Bank Group is owed approximately $120,000,000 and its claims are secured by liens on substantially all of the Debtor's assets.

48.     In late July 2009, when it became apparent that the Debtor could not continue to sustain its operations with its current capital structure, the Debtor determined that a sale of its business units as going concerns was in the best interest of its creditors and parties in interest.

49.     The Debtor filed the instant Chapter 11 bankruptcy proceeding to preserve its assets and operations for the benefit of its creditors.

## IV.   LIABILITIES[10]

50.     The chart below sets forth amounts outstanding under certain and related facilities on or about October 23, 2009 (exclusive of interest, fees, expenses and other amounts that may be chargeable), including amounts payable in connection with the early termination of certain interest rate hedging contracts:

| Credit and Related Facility | Approx. Balance Due |
| --- | --- |
| Tranche B Term Loan | $70,419,259 |
| Tranche C Term Loan | $5,366,926 |
| Revolving Loans | $34,999,036 |

---

[10] The descriptions of the claims against the Debtor contained in this motion are not intended to nor may they be construed as admissions regarding such claims.  All of the Debtor's rights, claims and defenses with respect to any asserted claims are fully preserved.

| Letters of Credit | $2,992,530 |
|---|---|
| PIK Amendment and Forbearance Fees | $2,048,605 |
| Swap Termination | $6,725,754 |

## A.   **Bank Group Loans.**

51.   On March 31, 2006, the Debtor entered into a credit facility provided by a group of banks (the "Bank Group") and other financial institutions led by Citizens Bank of Massachusetts (now RBS Citizens, N.A.), providing for $160.0 million in senior credit obligations comprised of a six-year $110.0 million term loan facility and a five-year $50.0 million revolving credit facility.  The revolving credit facility includes up to $5.0 million in letters of credit.

52.   The Debtor's credit facility is evidenced by, among other things, a Credit and Guaranty Agreement, dated March 31, 2006, as first amended and restated on April 12, 2006, and as further amended and restated on January 30, 2008 (as amended, the "Credit Agreement"). The Credit Agreement has been amended eight times since the second amendment and restatement, the last of which occurred on August 26, 2009.  Pursuant to the January 30, 2008 second amendment and restatement, Dynamic was added as a borrower under the Credit Agreement with respect to the revolving loan facility, although Dynamic's obligations are limited to amounts borrowed by it under the Credit Agreement.  As of the Petition Date, Dynamic owed approximately $22,700,000 under the revolving loan facility of the Credit Agreement.

53.   All of the Debtor's obligations under the Credit Agreement are secured by liens on substantially all of the Debtor's assets, including pledges of 100% of the stock in each of the

Debtor's domestic subsidiaries, and 65% of the stock in each foreign subsidiary. The Debtor's

obligations under the Credit Agreement are unconditionally guaranteed by all of the Debtor's

domestic subsidiaries and not by the Included Subsidiaries.

54.    Dynamic's obligations under the credit facility are unconditionally guaranteed by

ExchangeCo, and are secured by substantially all of Dynamic's and ExchangeCo's assets.

55.    Except for the Tranche C Term Loan, all loans under the Credit Agreement bear

interest at a rate of LIBOR plus 8%. The Tranche C Term Loan bears interest at a rate of ten

percent (10%). Availability under the revolving loan facility, whether for the Debtor or

Dynamic, is based on eighty percent (80%) of their respective eligible accounts receivable and

fifty percent (50%) of their respective eligible inventory.

56.    The eighth amendment to the Credit Agreement (the "8th Amendment"), among

other things, provided an additional $1.0 million to the Debtor to fund operations while the

Debtor was pursuing a going-concern buyer for its businesses. The 8th Amendment contained

various asset sale milestones and provided a $5.0 million cap on the existing over advance under

the Credit Agreement. The Bank Group's obligation to advance under the 8th Amendment

expired on August 31, 2009.

57.    All of the advances under the Credit Agreement were made by members of the

Bank Group, which does not include any "insiders" of the Debtor (although Sterling, as defined

below, indirectly funded the Tranche C Term Loan through its purchase of a participation

interest in the Tranche C Term Loan from RBS Citizens).

58.    Three Sterling-affiliated investment funds hold a 100% participation interest in

the Tranche C Term Loan. As is described below, Sterling holds both unsecured subordinated

debt positions and equity interests in GPX. The Tranche C Term Loan was advanced under the

Credit Agreement, but is a last-out tranche.  The Tranche C Term Loan bears interest at 10%,
which accrues daily and compounds quarterly (no cash payment), and matures 6 months after the
maturity of the other tranches advanced under the Credit Agreement.

**B.**     **Trade Debt and Other Obligations.**

59.     As of the Petition Date and excluding inter-company and insider debt, the
Debtor's non-priority unsecured debt totaled approximately $36.2 million.  Of this amount,
approximately $5.2 million consisted of trade debt and $31.0 million consisted of other
unsecured obligations, such as lease obligations, accrued expenses and unsecured loan
obligations.

60.     As of the Petition Date, the Debtor owed customs duties, incurred in the ordinary
course of business of approximately $5.6 million, which may constitute a priority claim pursuant
to Section 507 of the Bankruptcy Code.  The Debtor may also owe amounts, currently
undetermined, on account of the Antidumping and Countervailing Duty Investigations that may
constitute priority claims.

61.     Prior to the Petition Date, and consistent with its recent practice, the Debtor made
advance payment to employees for wages and salaries.  While the Debtor does not believe that it
owes any base wages that may constitute priority claims under Section 507 of the Bankruptcy
Code, there may be amounts, accrued in the ordinary course of business, owed on account of
overtime pay, expense reimbursement, benefits and vacation and sick pay that may constitute
priority claims.

62.     Sterling holds $5.25 million of unsecured subordinated debt (the "Sterling
SubDebt") issued on February 15, 2008.  The Sterling SubDebt bears interest at 9%,

compounded quarterly. All payments on the Sterling SubDebt are subordinated to payment in full of the senior obligations under the Credit Agreement.

63.     David Ganz, a former officer and shareholder and the father of Bryan Ganz, a current officer and director of the Debtor, holds an unsecured note in the approximate amount of $9.85 million (the "Ganz Note"). The Ganz Note was originally issued in 2002 and matures in 2011 on account of loans to the Debtor, and bears interest at a rate of nine percent (9%) per annum. All payments under the Ganz Note are subordinated to payment in full of the senior obligations under the Credit Agreement.

64.     Sterling's unsecured claims against the Debtor also include a $2.0 million fee for services associated with the sale of the Rumaguma subsidiary in September 2008, deferred management fees of approximately $859,000, a $1.7 million financing fee associated with the Term C Tranche Loan and various contingent "advisory" fees on account of its support and advise relating to pricing and business structure of the sale.

65.     The Debtor owes Bryan Ganz, Neil Ganz, Robert Sherkin and Peter Koszo approximately $957,000, in the aggregate, for deferred compensation from 2007. The Debtor owes Bryan and Neil Ganz approximately $858,000 and $429,000, respectively, for success fees in connection with the sale of the Rumaguma subsidiary in September 2008. Craig Steinke, the Debtor's President and Chief Executive Officer, is owed a $500,000 deferred bonus associated with the January 16, 2009 amendment to the Credit Agreement. Mr. Steinke's employment agreement also provides for a $500,000 bonus on the earliest to occur of (a) the refinancing of the senior secured credit facility, (b) a change of control and (c) March 15, 2010, unless the payment of the bonus would jeopardize the Debtor's ability to continue as a going concern in which case payment will be delayed until it would not have such effect.

**C.**     **Interest Holders.**

66.     The Debtor has four classes of stock: Series AA Preferred Stock, Series BB

Preferred Stock, Common Stock and Special Voting Stock.  Sterling holds 10,000 shares of

Series AA Preferred Stock and 22,556.03 shares of Series BB Participating Preferred Stock.

There  are approximately 86,890 shares of Common Stock issued and outstanding and owned

primarily by the Ganz family.  There are approximately 79,967 shares of Special Voting Stock

issued and outstanding and owned by former common stock holders of Dynamic.

67.     Both Sterling and various members of the Bank Group were issued warrants with

respect to the Common Stock.  Options to acquire 10,200 shares have been granted (and remain

outstanding) to the Debtor employees under the Debtor's Equity Incentive Plan.  All of these

options have vested.  Lastly, the Debtor's board of directors approved a grant of 26,737 shares of

restricted stock to me, 50% of which vested on grant and 50% of which vested 18 months

following the grant date  The grant was to be effective in February 2009 but final documentation

has not been executed and the shares have not yet been issued

**V.     REQUEST FOR RELIEF**

**A.     Authority to Sell Assets.**

68.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor requests the

authority to sell the Solid Tire Assets free and clear of all liens, claims and interests.  Except for

the Assumed Liabilities, all liens and claims against or interests in the Solid Tire Assets will

attach to the proceeds from the sale to the same extent, priority and validity that existed on the

Petition Date.

69.     The Bankruptcy Code requires court approval for the use, sale or lease of a

Debtor's assets outside the ordinary course of business.  *See* 11 U.S.C. § 363.  In pertinent part,

Section 363(b)(1) provides that a "trustee, after notice and a hearing, may use, sell, or lease

other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

70.    Courts have approved a sale of a debtor's assets if the proposed transaction

represents a reasonable business judgment on the part of the debtor. *See In re Martin*, 91 F.3d

389, 396 (3d Cir. 1996); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also*

*Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Thomas McKinnon*

*Securities, Inc.*, 120 B.R 301 (Bankr. S.D.N.Y. 1990); *In re Coastal Indus., Inc.*, 63 B.R 361,367

(Bankr. N.D. Ohio 1986); *In re Baldwin United Corp.*, 43 B.R 888 (Bankr. S.D. Ohio 1984).

71.    As a result of the financial stress resulting from the combination of the AD/CVD

duties and the global recession, the Debtor concluded that it could not continue its operations

under its current capital structure.  In order to preserve its operations and the jobs related to those

operations, it is necessary for the Debtor to sell its primary business units as going concerns.

Going concern sales of the Debtor's primary business units will also provide creditors an

ongoing source of new business.

72.    Absent the sale of the Solid Tire Assets and the Debtor's other business units as

going concerns, the Debtor would likely be forced to liquidate its assets.  Such a liquidation

would return a fraction of the value of the assets that would be received in a going concern sale

of the Solid Tire Assets.  Moreover, the liquidation would result in the loss of the jobs associated

with the Solid Tire Assets as well as the loss of business for vendors and customers.

73.    The Debtor has concluded, in its business judgment, that the proposed sale of the

Solid Tire Assets to MITL will result in the best value for the Solid Tire Assets.  The sale of the

Solid Tire Assets is therefore in the best interest of the Estate and its creditors, and approval of

the Sale is warranted. *See In re Martin*, 91 F.3d 389, 396; *In re Lionel Corp.*, 722 F.2d 1063, 1070.

74.     Grounds exist to sell the Solid Tire Assets because the holders of interests in the Solid Tire Assets either consent to the sale or "may be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." *See* 11 U.S.C. § 363(f)(5).

75.     The Debtor requests that the Court waive the ten (10) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(g).

**B.     Authority to Assume/Reject Executory Contracts And Unexpired Leases.**

76.     Subject to court approval, Section 365(a) of the Bankruptcy Code authorizes a trustee to assume and assign or reject an executory contract or unexpired lease. *See* 11 U.S.C. § 365(a). The standard for determining whether an executory contract or unexpired lease should be assumed or rejected is the "business judgment" test. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional").

77.     Upon finding that a trustee has exercised sound business judgment in determining that the assumption or rejection is in the best interests of its estate, the court should approve the assumption or rejection under Section 365(a) of the Bankruptcy Code. *See, e.g., In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990).

78.     The assumption and assignment of the Assumed Contracts and the rejection of the Terminated Contracts are both necessary for the consummation of the Solid Tire APA. The Assumed Contracts are necessary to permit MITL to operate the Solid Tire Assets. The rejection of the Terminated Contracts is necessary to remove material impediments to MITL's operation

of the Solid Tire Assets. The Debtor is requesting the authority to assume the Assumed

Contracts and to reject the Terminated Contracts only in the event that the sale of the Solid Tire

Assets closes.

79.    As is described above, the consummation of the sale contemplated by the Solid

Tire APA is in the best interest of the Debtor, its creditors and parties in interest. Because the

assumption and assignment of the Assumed Contracts and the rejection of the Terminated

Contracts are both necessary for the consummation of the Solid Tire APA, the Debtor has

determined, in its business judgment, that such assumption and assignment and such rejection is

also in the best interest of the Debtor, its creditors and parties in interest.

80.    The assumption and assignment of the Assumed Contracts and the rejection of the

Terminated Contracts is therefore warranted pursuant to Section 365(a) of the Bankruptcy Code.

*See In re Orion Pictures Corp.*, 4 F.3d at 1098.

## VI.    NOTICE

81.    The Debtor has served this motion on the Office of the United States Trustee, all

of the Debtor's secured creditors, counsel to the Creditors' Committee and all parties having

filed a notice of appearance in the above captioned case.

82.    Contemporaneously with the filing of this motion, the Debtor has filed the *Motion

by Debtor to (A) Amend Bid Procedures Order, (B) Approve Termination Fee in Connection

With Private Sale of Solid Tire Assets, (C) Establish Hearing Date And Related Deadlines For

Proposed Sale, And (D) Approve Form And Manner of Service* (the "Notice Motion") with

respect to the proposed private sale to MITL. The Debtor will serve this motion in accordance

with any order entered by the Court with respect to the Notice Motion.

83.    The Debtor submits that such service is appropriate given the nature of the relief requested in this motion.

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached as Exhibit B: (a) approving this motion, (b) authorizing the sale of the Solid Tire Assets as contemplated by the Solid Tire APA, (c) authorizing the Debtor to take the steps necessary to the effectuate the Solid Tire APA, (d) authorizing the Debtor to assume and assign the executory contracts and unexpired leases contemplated by the Solid Tire APA, including the Ancillary Agreements, (e) authorizing the Debtor to reject the executory contracts and unexpired leases contemplated by the Solid Tire APA, (f) waiving the stay provisions of Federal Rule of Bankruptcy Procedure 6004(g), and (g) granting such other relief as this Court deems proper.

Respectfully Submitted,

GPX INTERNATIONAL TIRE CORPORATION
By its proposed counsel,


/s/ D. Ethan Jeffery
Harold B. Murphy (BBO #362610)
D. Ethan Jeffery (BBO #631941)
Natalie B. Sawyer (BBO #660072)
HANIFY & KING, P.C.
One Beacon Street
Boston, MA  02108-3107
Tel: (617) 423-0400
Fax: (617) 556-8985
dej@hanify.com

Dated: November 12, 2009
::ODMA\PCDOCS\DOCS\545827\1